JAMES K. SEBREE, Plaintiff in Error, *vs.* THE BOARD OF
EDUCATION, Defendant in Error.—AVA W. FARWELL
*et al.* Plaintiffs in Error, *vs.* THE BOARD OF EDUCA-
TION, Defendant in Error.

*Opinion filed June 21, 1912.*

1. APPRAISEMENTS—*there is a distinction between an appraise-
ment and arbitration.* An arbitration presupposes a controversy
to be settled by the arbitrators, acting judicially and according to
certain rules of procedure, whereas an appraisement is to prevent
or preclude controversies or disputes, and the appraisers have a
wide discretion as to their methods of procedure.

2. SAME—*appraisers are not required to give notice of their
meetings.* Appraisers are expected to act upon their own knowl-
edge and investigation, and are not required to give notice of
their meetings, hear evidence or receive the statements of the par-
ties unless there is some provision to the contrary in the agree-
ment under which they are appointed.

3. SAME—*honest conclusions of appraisers are binding upon
the parties.* As long as appraisers act honestly and in good faith
they have a wide discretion as to their methods of procedure and
sources of information, and their conclusions, in the absence of
fraud or mistake, are binding upon the parties.

4. SAME—*what does not render finding of appraisers invalid.*
Where an agreement for the appraisement of leased school lands
is silent as to how the appraisers shall be paid, the mere fact
that the board of education, in the first instance, allows the bills
presented by them for their services does not, of itself, invali-
date their finding.

5. SAME—*an appraiser is supposed to gain information in any
way he desires.* While an arbitrator, like a juror, should not talk
with the parties or outsiders with reference to the case or obtain
information as to the matter in dispute out of the presence of the
parties, yet an appraiser may obtain information in any way he
desires, and it is not improper for him, in honestly seeking in-
formation, to do things which would be considered improper in
an arbitrator or juror.

6. SAME—*finding should not be disturbed if acts complained of
were not calculated to improperly influence the result.* While ap-
praisers, like arbitrators, must act impartially and without bias,
yet the finding of appraisers should not be disturbed because of

the actions of the appraisers, unless it appears such actions were calculated to improperly influence the result.

7. SAME—*finding will not be set aside because valuation appears too high.* The finding of appraisers is conclusive upon the parties in the absence of fraud or mistake, and will not be set aside merely because the valuation appears too high.

8. SAME—*when appraisers may consider effect, if any, of re-valuation clause in lease.* In ascertaining the fair cash market value of land under a long-term lease providing that the appraisers, in determining such value without including improvements, might consider the improvements, the character, condition, value, cost, rental, expenses and other particulars thereof, and any other information bearing upon the value of the land, the appraisers may consider the effect, if any, of a ten-year re-valuation clause in the lease upon the actual value of the land.

9. SAME—*what evidence not admissible in determining value of land.* In a proceeding to enjoin the enforcement of an appraisal of the value of school land under a long-term lease containing a re-valuation clause, it is improper to admit in evidence, on the question of the actual value of the land, transactions involving long-term leases of other school lands, where such leases contained no re-valuation clause and the value was fixed as the result of a compromise between the various lessees and the board of education.

WRIT OF ERROR to the Branch "B" Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

HARRISON MUSGRAVE, and WILLIAM S. OPPENHEIM, (JOHN H. S. LEE, and E. M. ASHCRAFT, of counsel,) for plaintiffs in error.

FRANK HAMLIN, and ANGUS ROY SHANNON, for defendant in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

James K. Sebree filed in the circuit court of Cook county a bill against the Board of Education of the City of Chicago to enjoin the enforcement of an appraisement concerning the leasehold interests of certain school fund property

in that city. The chancellor set aside the appraisement and fixed a new valuation for the premises. The decree of the circuit court was reversed and the cause remanded by the Appellate Court, with directions to dismiss the bill for want of equity. The case has been brought here on a petition for *certiorari*. Ava W. Farwell and others filed a like bill concerning certain property immediately across the alley south from that in which Sebree is interested. The records in the two cases were substantially the same both in the circuit and Appellate Courts, and the parties in the latter case have adopted here the briefs in the Sebree case. The two cases were consolidated in this court and will be considered together.

The records disclose that there are in the city of Chicago a number of tracts of real estate acquired by the board of education of that city as a part of the government grant of sections 16, being now held in trust for educational purposes. This real estate is called in these records "school fund property." Much of it is in the heart of the business section of Chicago and very valuable. The property of which Sebree is lessee consists of lots 18 and 19 in block 142, in School Section addition to Chicago, and faces west on Dearborn street between Madison and Monroe, immediately adjoining on the south the Tribune building. Each lot has twenty-four feet front and runs back one hundred and twenty feet to a fifteen-foot north and south alley. There is another alley of the same width adjoining lot 19 on the south. Immediately south of this last alley lie lots 20 and 21, in the same block and of the same size as the Sebree lots. These two lots are leased by the Farwells. On lots 18 and 19 there is a five-story building, and on lots 20 and 21 a building of similar character two or three stories higher, the two buildings being connected on corresponding floors above the first story by small passageways across the alley. Both buildings are used as a part of the Saratoga Hotel.

In 1880 the board of education leased lots 18 and 19 to Francis Peabody for fifty years, expiring May 8, 1930, at an annual rental for the first five years of $2735. On the same date, under a similar lease, Beverly R. Chambers leased lots 20 and 21 from the board of education. Both these leases provided that within three months before May 8, 1885, the board of education was to appoint "three discreet male residents of the city of Chicago who are freeholders, and who are not interested as lessees or mortgagees of school property in said city, to determine, under oath first duly taken, the true cash value of said premises above demised at the time of such appraisal, not taking into consideration the improvements thereon," etc. The annual rent was to be six per cent of the value so fixed. It was further agreed in each lease by the lessee, for himself and his representatives, "that all personal notice of the appointment of any appraisers under this lease, and of the meetings of any such appraisers, is hereby expressly waived, and that he and they shall be estopped from objecting to any matter connected with the appointment or qualification of such appraisers unless such objection be made in writing to said board of education and filed with the clerk of said board within thirty days after the appointment of such appraisers, and that he and they shall also be estopped from objecting to any matter connected with the action of such appraisers unless such objection be made in writing to said board of education and filed with the clerk of said board within thirty days after the filing of such valuation or assessment in the office of the clerk of the board of education by such appraisers," etc. Subsequent re-valuations were to be made each five years thereafter. The lease could be assigned without consent of the board under certain conditions and the assignments were to be subject to the terms of the original leases. These leaseholds have since come by assignment into the possession of plaintiffs in error.

In the early part of 1885 an appraisement was made by three appraisers appointed by the board of education. The then lessees of the property in question objected to the manner of making this appraisement and filed a bill in the superior court of Cook county for an injunction to restrain its enforcement. After litigation lasting some years a compromise was effected and supplemental leases dated June 15, 1888, were executed. The original leases were to remain in force except as modified by the supplemental leases. The re-valuation period was changed to ten years and the time when the leases were to expire was extended to May 8, 1985. The chief provisions of the supplemental leases to be construed on this hearing read:

"*Fourth*—* * * That in lieu of the method of appointing appraisers for the purpose of ascertaining, determining and fixing the amount of rent to be paid for said demised land, as provided in and by the terms of said lease and this supplement thereto, appraisers shall be appointed as follows: The board of education of the city of Chicago, any judge holding the circuit court of the United States in and for the northern district of Illinois for the time being, and the judge of the probate court of Cook county, Illinois, or the successor of said court having probate jurisdiction for the time being, shall each appoint one discreet male resident of the city of Chicago not interested as lessee or mortgagee of school property in said city, to determine, under oath first duly taken, the true cash value of said demised land at the time of such appraisal, exclusive of the improvements thereon. The person appointed by the board of education shall be the chairman of said appraisers and shall call their meetings and preside thereat. Any two of said appraisers shall have power to make the appraisement. In case the person appointed by the board of education shall, before an appraisement is made, die, resign or neglect or refuse to act as an appraiser, the board of education may appoint another person in his place and stead as appraiser, with the same power and authority as if he had been appointed in the first instance. In case either

of the persons, his successor or successors, appointed by any judge holding said circuit court of the United States, or by the judge of the probate court of Cook county, or the successor of said court having probate jurisdiction, shall die or resign before an appraisement is made, and in case either of said persons, or the successor or successors of them or either of them, shall neglect, omit or refuse to act as appraiser, or to make or report an appraisement in accordance with the purport and intention of said lease and this supplement thereto, the board of education, upon evidence satisfactory to itself, may remove such person or persons for such neglect, omission or refusal to act as appraiser or to make or report an appraisement, and the vacancy or vacancies so occurring, either by death, resignation or removal, shall, on the request of either of the parties hereto, be filled within ten days after such request by the appointment of another person by the judge whose appointee has died or resigned or has been removed.   *   *   *   It is hereby declared by the parties hereto that it is not the purpose of this instrument that the persons appointed as appraisers hereunder, or either of them, shall be the representatives of either of the parties hereto.

"*Fifth*—That, notwithstanding anything in said lease or in this supplement thereto contained, the persons who shall at any time be appointed thereunder to fix and determine the value of the leased land, for the purpose of ascertaining and fixing the amount of rent to be paid therefor, shall at all times and under all circumstances be held to be appraisers and not arbitrators, and shall not be bound to give notice of their meetings or proceedings to the parties hereto, except as hereinafter expressly provided:

"(a) Upon their appointment the appraisers shall cause a notice of the fact to be sent by mail, addressed to the lessee, his heirs, executors, administrators, successors or assigns, at the city of Chicago, Illinois, or at such other address in the city of Chicago, Cook county, Illinois, as he, they or it may have previously furnished to the lessor. * * *

"(b) Within twenty (20) days after the mailing of said notice of appointment of appraisers the lessee may, if

he so desire, file with the appraisers a written statement or argument for their information, and shall at the same time furnish a copy of the same to the lessors.

"(c) Within twenty days after the receipt of such statement or argument by the lessor it may cause to be filed with the appraisers a statement or argument in writing, a copy of which shall be furnished to the lessee.

"(d) The lessee may file a reply to the statement or argument of the lessor within ten (10) days after receiving such copy.

"(e) The sole purpose of the four preceding provisions is to allow the parties to present to the appraisers information within their possession and their views concerning the value of the demised land. But it is expressly understood and agreed that the appraisers shall not be concluded, in any event, by the statement so made, but shall be at liberty to seek or obtain such information as they deem pertinent, either with or without notice to the parties, and to make their appraisal upon all facts within their knowledge, notwithstanding anything contained in the said written statements above provided for.

"*Sixth*—That, notwithstanding anything in said lease contained, the appraisers shall be at liberty, in forming their judgment of the value of the land without including the value of the improvements thereon, to take into consideration, if and so far as they deem it pertinent to do so, the improvements on such land, and the character, condition, value, cost, rental, expenses and other particulars thereof, and any other facts or information, from whatever source, bearing upon the question of the actual value of said land; and it shall be the duty of the lessee to furnish the appraisers promptly, on request, a statement showing the rental receipts and disbursements on account of said improvements for five years, as near as may be, next preceding the time of the appraisement. * * *

"*Eighth*—And it is further understood and agreed by and between the parties hereto, that should there be for any cause a failure in the making of an appraisement in any year or years wherein an appraisement should be made un-

der and according to the terms of said lease and this sup-
plement thereto, the amount of annual rent to be paid by
the party of the second part for the ensuing period of ten
years shall not be rendered uncertain or undetermined by
reason of such failure in making an appraisement, but the
sum to be paid as annual rental for and during the period
of ten years from the eighth day of May in any year when
an appraisement should have been made and failed to be
made, shall be the same as that paid or reserved as rent
during the last preceding period of ten years prior to said
eighth day of May."

In February, 1895, John McLaren, Gwynn Garnett and
Eugene Cary were appointed appraisers under the pro-
visions of these leases and appraised lots 18 and 19 at
$190,000 as the fair cash value, which would make the
annual rental $11,400. Lots 20 and 21 were appraised at
$187,000, making the annual rental $11,220. This was ap-
parently satisfactory to all. In February, 1905, the board
of education appointed John McLaren as appraiser, the
judge of the probate court appointed Arba N. Waterman,
and the judge of the United States circuit court first ap-
pointed Elbridge G. Keith, whose resignation was accepted
on account of ill-health and William D. Kerfoot appointed
his successor. These three appraisers were appointed to
appraise the values of various school fund tracts under
school fund leases, the appointments not specifically de-
scribing the property. The property under twenty-three
leases, including the four lots here in question, was ap-
praised under this appointment. The representatives of the
leasehold interests in the four lots filed suggestions and
authorities with the appraisers as to the cash value of the
property as well as the leasehold values, and the represen-
tatives of the board of education thereafter filed their sug-
gestions. The appraisers fixed the cash value of lots 18
and 19 at $384,000, making the annual rental $23,040, be-
ing six per cent of the appraisement. They fixed the same
value as to lots 20 and 21. After this appraisement had

been submitted to the board of education the plaintiffs in error filed protests with that board and asked that the appraisement be modified. This was refused and the board instructed its secretary and attorney to enforce the forfeitures of the leaseholds if the rent was not paid.

A large part of the briefs and arguments is devoted to a discussion of the duties of the appraisers under these leases and whether they should be governed by the rules applying to appraisers or arbitrators. Some of the rules of law that apply to arbitrators apply in the same manner to appraisers, while others do not apply. It is somewhat difficult to lay down any general rules that will show plainly the distinction between the two. The terms "appraisement" and "arbitration" are sometimes used interchangeably and frequently without any clear difference in meaning. There is, however, a plain distinction between an appraisement and an arbitration. The latter, in the proper sense of the term, presupposes a controversy or a difference to be tried and decided. Arbitrators generally proceed in a *quasi* judicial manner to settle the dispute. Their jurisdiction is in the nature of a judicial inquiry, and certain rules of procedure must be observed or the award will be void. On the other hand, an appraisal is the proper term to be used when an appraisement or valuation is to be made as auxiliary or incident to a contract. The appraisers are selected to preclude or prevent, by appraisal, the arising of differences, and not to settle differences which have already arisen. Unless there are some restrictions in the agreement under which they are appointed, appraisers are generally expected to act on their own knowledge and investigation, and hence are not required to give notice of hearings, hear evidence or receive the statements of the parties. As long as appraisers act honestly and in good faith they have a wide discretion as to their methods of procedure and sources of information. Their conclusions, in the absence of fraud or mistake, will be binding upon the parties. *Norton* v.

*Gale,* 95 Ill. 533; *Stose* v. *Heissler,* 120 id. 433; *Pearson* v. *Sanderson,* 128 id. 88; *Chicago Auditorium Ass'n* v. *Fine Arts Building,* 244 id. 532; Morse on Arbitration and Award, 38; Russell on Award, (7th ed.) 42; *Noble* v. *Grandin,* 125 Mich. 383; *Flint* v. *Pearce,* 11 R. I. 576; *Palmer* v. *Clark,* 160 Mass. 373; *Omaha Water Co.* v. *City of Omaha,* 15 Ann. Cas. 498, note; 162 Fed. Rep. 225; *Wurster* v. *Armfield,* 67 App. Div. (N. Y.) 158; 1 Mechem on Sales, sec. 212, and note.

In the original leases herein the parties who were to re-value the property were called appraisers. No special qualifications were required except that they should be freeholders of the city of Chicago and not interested as lessees or mortgagees of school property. Nothing was said in the original leases as to what procedure they should follow. In the supplemental lease it was stated that, notwithstanding anything said in the leases or supplement, the persons appointed to fix and determine the value of the leased land "shall at all times and under all circumstances be held to be appraisers and not arbitrators." After providing in some detail as to the method of procedure, section 5 of the supplemental lease concludes that it was expressly understood that the appraisers should not be bound by the statements made by the parties and submitted to them, "but shall be at liberty to seek or obtain such information as they deem pertinent, either with or without notice to the parties, and to make their appraisal upon all facts within their knowledge, notwithstanding anything contained in said written statements above provided for." In section 6 of the supplemental lease it is stated that they may take into consideration, in forming their judgment, "any other facts or information, from whatever source." The appraisers were not to act as partisans, for a part of section 4 of the supplemental lease reads: "It is not the purpose of this instrument that the persons appointed as appraisers hereunder, or either of them, shall be the rep-

resentatives of either of the parties hereto." A study of the original and supplemental leases clearly shows that the parties thereto intended that the persons chosen should be held to be and act as appraisers in the usual and broadest sense of the term, except that the parties were to have an opportunity of filing their suggestions with the appraisers, and that the appraisers were not to consider themselves as acting as the representatives of either party to the leases.

Plaintiffs in error argue that the appraisers were improperly appointed through the instrumentality of the board of education. Under the original leases it is clear that the lessees were to have nothing to do with the appointment of the appraisers,—the board of education was to make the selection. In the dispute over these leases this method of appointment was changed and a provision inserted in the supplemental lease that one of the appraisers should be appointed by the board of education, one by the judge of the United States circuit court and one by the judge of the probate court of Cook county. Nothing is said in the supplemental lease as to which party, if either, was to request the judges of the two courts to appoint appraisers, although it is provided in section 4 that if either of the appraisers appointed by the judges fails to perform his duties he may be removed by the board of education "upon evidence satisfactory to itself," and that the place of the one so removed, dying or resigning shall within ten days thereafter, on the request of either party, be filled by appointment by the judge who made the original appointment. It is also provided in section 5 of said supplemental lease that the appraisers, upon their appointment, shall send notice of the fact, by mail, to the lessee, but there is no provision as to notice being sent by the appraisers to the board of education. It is clear that when the supplemental lease was executed it was not intended that there should be a hearing before the respective judges at the time their appointments were made. Considering all the provisions of

the lease together, we think it a fair conclusion that it was intended the appointment of the appraisers by the two judges in the first instance should be requested by the board of education. That course would almost certainly have to be followed when property was to be appraised which was increasing as rapidly in value as the property here in question has increased during the last twenty years, for until a new appraisement was made (it was provided under the leases) the old appraisement would hold. Naturally the lessees would not care, under such circumstances, for a re-appraisement. Construed most favorably for plaintiffs in error's contention, the leases could not mean more than that either party, without a notice to the other, could request the respective judges to appoint appraisers. Moreover, the original leases provided that the lessees and their representatives would be estopped from objecting to the manner of appointment or qualifications of the appraisers unless an objection was made in writing to such board of education within thirty days after the appointment. This provision was still in force after the execution of the supplemental lease. No objection was made on behalf of plaintiffs in error as to the qualifications or method of appointment of the appraisers until after the appraisement was made and reported to the board of education, though all plaintiffs in error were theretofore represented by counsel, who filed suggestions and briefs with the appraisers, in accordance with the provisions of the lease, before the appraisals were made.

Further objection is made to the qualifications of Mr. McLaren as appraiser because he had formerly been a member of the board of education and in 1895 had served as appraiser in valuing the property under these and other leases of school fund property. His service in both of such capacities is shown by the records of the board of education and no attempt was made to conceal the fact. The Farwells were owners of this leasehold interest in 1895,

and it must be presumed that they knew he had served as an appraiser at that time. Clearly, under the provisions of the lease, objections to the method of appointment of the appraisers, or on account of Mr. McLaren's alleged disqualification, were waived by the plaintiffs in error, as they did not raise them within thirty days after receiving notice of their appointment.

It is further objected that the appraisers were disqualified because they also appraised other property under other school leases and were paid by the board of education $2500 each for all their services. Had the plaintiffs in error referred to the proceedings of the board with reference to the appointment of these appraisers they would have readily ascertained that they were appointed for the appraisement of all the various tracts and not for any particular piece of property. Furthermore, the appraisements under all these twenty-three leases were made by the appraisers in the same report, the valuation of the property under each lease being in a separate item. Plaintiffs in error filed objections as to the appraisement of their respective properties, shortly after this report was filed, with the board of education. Necessarily they must have known, before they filed the objections, that the appraisers had appraised other property under other leases, but they did not object specifically on this ground, and, so far as we can ascertain from the records, this objection was raised for the first time in the Appellate Court. Objections are waived unless raised at the earliest opportunity. *Story* v. *DeArmond,* 179 Ill. 510; *Chicago Auditorium Ass'n* v. *Fine Arts Building, supra.*

Plaintiffs in error further urge that the records show that the appraisers acted as if they were representing the board of education, and therefore contrary to the provisions of the supplemental lease, which specifically required that they should not act for either party. In support of their contention counsel examined Mr. McLaren over the

objection of defendant in error, and introduced evidence given by Mr. Kerfoot in a former trial concerning an appraisement made by these same appraisers in connection with another school fund lease. Plaintiffs in error contended, at the time Mr. Kerfoot's evidence was introduced in this case, that he could not be found to be served with a subpœna and that they had reason to believe he was attempting to escape service. The testimony of Mr. Kerfoot taken in another case was plainly inadmissible under the rules laid down in *London Guarantee and Accident Co.* v. *American Cereal Co.* 251 Ill. 123. We do not find it necessary to decide whether the rule of law that the testimony of arbitrators can only be received to impeach their award in cases of fraud applies to the admission of the testimony of appraisers to impeach their finding. If it be assumed for the purposes of this opinion that the testimony of Mr. McLaren, one of the appraisers, was admissible, his testimony in no way tends to impeach the finding of the appraisers. On the contrary, it tends to support that finding. He testified that he did not intend to act as the representative of either party and that he tried to consider fairly all the facts as they affected the value of the property.

There is, however, competent evidence in the record that the board of education passed a resolution appointing Mr. McLaren as "its appraiser;" that on being notified of that fact he replied that he had received notice of their action "appointing me appraiser for the board of education, to act with appraisers yet to be appointed, in the appraisement of school land; I accept the appointment; as soon as I am notified of the appointment of the other two appraisers I will organize the commission and proceed to work." It is urged that this resolution and letter of acceptance showed that he considered himself the appraiser for the board of education, and the conclusion is drawn that he thought he was to act for the board, contrary to the purpose and spirit of the supplemental lease. We think

it is a strained construction to draw any such conclusion. Under the supplemental lease the board of education was to appoint an appraiser, who was to be chairman of the appraisers and call them together. Nothing was said in the resolution of appointment or in the acceptance indicating that Mr. McLaren intended to act in any other way than in accordance with the provisions of the supplemental lease.

It is further urged that the appraisers were influenced by the fact that they were paid for their work entirely by the board of education. It appears that appraisers appointed in 1895 were paid for their services by the board, the lessees paying nothing. Plaintiff in error Sebree and his attorney testified on this trial that they knew nothing about this fact until some time after they had filed their objections to the appraisement with the board. It must be presumed, as the plaintiffs in error representing the Farwell tract were the owners of the same leasehold interest in 1895, that they knew about the method of paying those appraisers. No objection was made by plaintiffs in error as to such payment by the board of education until the respective bills of complaint were filed in these cases. Under the original leases the three appraisers all being appointed by the board of education, manifestly they were to be paid by that board. The supplemental lease is silent as to how the appraisers were to be paid. We find no evidence in the record indicating that any member of the board, or any of its officials or agents, had ever talked with either of the appraisers as to the method of payment, before their report was filed and all their work completed. Without consulting any member of the board or its officials, the appraisers, after they had finished their work and handed in their report, made out their bills and sent them to the board. The bills were allowed by the board at the same meeting at which the objections of plaintiffs in error to the appraisement were filed. No complaint is made that the appraisers were overpaid for their services. These appraisers ap-

praised property under twenty-three different leases, the total valuation being, in round numbers, $5,500,000.

It is objected in this connection that the appraisers were asked by the president of the board of education, while they were appraising this school fund property, to make an appraisement of two or three pieces of property belonging to the board of education not "school fund" property. It appears from the record that they appraised those tracts as requested and were not paid for so doing, unless the sum of $2500 was intended to include payment for such extra services. We think, from the evidence, that they appraised this outside property as an accommodation to the president of the board and not for pay.

The method of procedure is one of the chief differences between arbitration and appraisement. It is generally held that an arbitrator, like a juror, should not talk with the parties or with any outsiders with reference to the case or obtain information on the matter in dispute out of the presence of the parties; an appraiser, on the contrary, is supposed to gain information in any way he desires. Most of the decisions cited by plaintiffs in error to uphold their contention that the evidence shows bias on the part of the appraisers are cases involving arbitrators or jurors, such as *Moshier* v. *Shear,* 102 Ill. 169, where this court held that for an arbitrator to talk about the subject matter of arbitration with a friend who had been an arbitrator in the same matter was improper and the practice would not be sanctioned by the court. Without question that rule would not apply to appraisements generally or to the appraisements under these leases, for it is intended that the appraisers here may obtain information in any way that they deem advisable. While bias or prejudice might be inferred from such action by arbitrators or jurors it would not be presumed as to appraisers. *Vane* v. *City of Evanston,* 150 Ill. 616, is also relied on by plaintiffs in error. In that case the petitioner in a special assessment proceeding, where

the jury were viewing the premises, furnished a lunch for them at a near by hotel. This court there held that while the law will not tolerate the slightest suspicion that the successful litigant has corrupted or improperly influenced the jury, yet the customary offices of civility and ordinary hospitality or courtesy extended to jurors, when not designed or calculated to influence them in their consideration of the case and which are devoid of suspicion, will not afford sufficient ground for setting aside the verdict and awarding a new trial. The verdict in that case was not set aside.

Arbitrators and appraisers should both act impartially and without bias. It is not uncommon, however, for a person appointed an arbitrator or appraiser by one of the parties to consider himself an agent for the person appointing him. In *Wheeling Gas Co.* v. *City of Wheeling,* 5 W. Va. 448, although the rule was strongly laid down that arbitrators, like jurors, should not only possess the quality of impartiality in fact, but should also sedulously shun all the possibilities even of insensible bias, it was held that when it was known, before they were chosen, that two arbitrators had preconceived opinions, even though they acted as partisans, the court would not, because of their actions, declare the award invalid. The fact that an arbitrator had formerly been an attorney for one of the parties was held not to invalidate the award; (*Goodrich* v. *Hulbert,* 123 Mass. 190;) that the parties were well acquainted before the arbitration and the principal facts were stated to one of the arbitrators, who expressed an opinion thereon, was held not to invalidate the finding; (*Morville* v. *American Tract Society,* 123 Mass. 129;) that one of the arbitrators previously performed like services for one of the parties and afterward received a position from one of them does not show bias or invalidate the award; (*Rowand* v. *Martin,* 7 Manitoba, 160;) that an arbitrator was also an arbi-

trator in another case involving similar questions did not disqualify him.  *Cheney* v. *Martin,* 127 Mass. 304.

It is apparent from an examination of the authorities that all do not agree as to just what is sufficient to justify the setting aside of a verdict, the award of arbitrators or the finding of appraisers.  The conclusion to be deduced from such an examination is, that each case must in a large measure be governed by its own circumstances; that the verdict, award or finding must not be disturbed if from a consideration of the case it appears that the acts complained of were not designed or calculated to improperly influence the result.  See, among many other authorities, *C. & M. S. R. R. Co.* v. *Hughes,* 28 Mich. 186; *Stemmer* v. *Insurance Co.* 33 Ore. 65; *Fox* v. *Hazelton,* 27 Mass. 275; *Graves* v. *Fisher,* 5 Me. 69; *Flatter* v. *McDermitt,* 25 Ind. 326; *Calcraft* v. *Roebuck,* 1 Ves. Jr. 221, and note; *People* v. *Nichols,* 11 Am. Rep. (N. Y.) 734.

The rule of law in this State has been that the findings of appraisers are conclusive upon the parties in the absence of fraud or mistake and will not be set aside merely because the valuation appears too high.  (*Stose* v. *Heissler, supra;* Morse on Arbitration, 38.)  We do not think the provision of the supplemental lease that the appraisers should not represent either party so changed this general rule that the payment of the appraisers' fees by one of the parties, under the circumstances shown in this record, should be held to show such bias as to invalidate the finding.  Neither does the fact that the appraisers, at the request of the president of the board of education, appraised two pieces of property which was not school fund property, whether gratis or otherwise, indicate such bias.  Men who are qualified, as it is not questioned these appraisers were, to do work of the magnitude and character required for the re-valuation of this school property, must possess sufficient intelligence and judgment to understand the provisions of the supplemental lease with reference to their not

acting as representatives for either party. Indeed, the chancellor in the court below, although setting aside their appraisal, specifically stated that he did not question the high standing and integrity of the appraisers or that they intended to be fair and impartial.

Plaintiffs in error further earnestly insist that the bias of the appraisers in arriving at their award appears from the valuation—about $66 a square foot—they placed upon this property. Proof as to many transactions involving sales and leases of property in this vicinity from 1895 to 1905 was made in the trial court. Six expert witnesses testified as to the fair cash market value of these four lots. There was a difference of opinion between these witnesses, as there is between counsel, as to whether, in determining the true cash value, the provisions of the leases for a revaluation every ten years should be taken into consideration. The witness Bacheldor, for plaintiffs in error, testified that the fair cash market value of each tract of two lots, irrespective of any leases or improvements, during the ten-year term following 1905, was $216,000. On these figures the land was worth $37.50 a square foot. The other two witnesses for plaintiffs in error (McLane and Warner) testified that, disregarding any leases or improvements, they would place the fair cash market value at about $288,000, or $50 a square foot. Two of the witnesses for defendant in error (Winston and Ulm) placed the fair cash market value of each tract of two lots, disregarding leases and improvements, at $488,000, or about $85 a square foot, while the third witness (Wood) considered the fair cash market value as $504,000, or $87.50 a square foot. The chancellor below fixed the value at the figure given by two of the witnesses for plaintiffs in error, $288,000, or $50 a square foot.

Evidence of many sales or long-term leases of property within two or three blocks of the real estate here in question was offered to show the true cash value of the land. The evidence tends to show that a 99-year lease is prac-

tically a sale, so far as values are concerned; that the value used in estimating the rental in a 99-year lease is for all practical purposes the same as the value in a sale of the land. Seven transactions were introduced involving long-term school leases with the board of education for school fund property. The square-foot valuations varied all the way from $34.40 to $72.90. It appears that none of these leases contained re-valuation clauses. It is insisted by counsel for the defendant in error that these leases were not properly admitted in evidence because they were in no sense transactions in the open market but were compromises between the board of education and the various lessees. We shall refer to the admissibility of this evidence later on. Many sales or long-term leases were introduced of properties in the vicinity of these lots, varying from $17.36 to $138.49 per square foot. Attached as an exhibit to the bill of complaint (which was verified) is a list of twenty-six transactions, which varied in square-foot valuation from $35.16 to $264.93. This includes some State street property, which is generally higher than property on Dearborn street. All these transactions appear to have taken place from 1895 to 1905, inclusive, which was the limitation as to dates of sales and leases fixed by the trial court.

The testimony tended to show that in the congested business district of Chicago, within the so-called "loop," the values of property have gone up very rapidly in recent years; that as a result of the situation of this property none of it is on the market for sale or long-term leases; that purchasers are constantly looking for sales or leases; that few sales are now made and are growing less frequent, property owners feeling that there is a certainty of a great increase in value and therefore only being willing to make long-term leases. The difference in the value of various pieces of property in this district, as shown by the sales and long-term leases, depends, according to the evidence, upon the street, size of the property, location on the street

or in the block, light, character of adjoining buildings, the
necessity of the owner to enlarge his present quarters or
build in a particular location, and other elements which
the purchaser or owner may think enter into the value
of the property for any purpose for which it can be used.
Unless modified by the other provisions of these leases, the
phrase "true cash value," contained therein, must be held
to mean the same as the fair cash market value. The sup-
plemental lease provides that the appraisers, after taking
their oaths, shall determine "the true cash value of said
demised land at the time of such appraisal, exclusive of
the improvements thereon." This is substantially the same
provision as is found in the original lease. But section 6
of the supplemental lease also provides, "notwithstanding
anything in said lease contained, the appraisers shall be at
liberty, in forming their judgment of the value of the land
without including the value of the improvements thereon,
to take into consideration, if and so far as they deem it per-
tinent to do so, the improvements on such land, and the
character, condition, value, cost, rental, expenses and other
particulars thereof, and any other facts or information,
from whatever source, bearing upon the question of the
actual value of said land," etc. It is argued by counsel for
plaintiffs in error that under this last provision it was the
appraisers' duty, in finding the true cash value of the land,
to take into consideration the terms of the leases, and
especially the re-valuation clauses. The building on the
Sebree lots is five stories high and that on the Farwell
lots two or three stories higher, both being of the old style
"mill construction," standard throughout the city of Chi-
cago twenty or thirty years ago. About 1897, the evidence
shows, the construction of modern steel fire-proof build-
ings commenced, such buildings running now from twelve
to twenty-four stories in height. The erection of many of
such buildings within the loop has rendered it possible to
obtain a much larger net income, in the way of rentals,

from lots in that district than was possible before this class of structures was erected, and this has been one of the chief causes for the great advance in real estate values in the down-town district of Chicago.

Counsel for plaintiffs in error also argue that no man exercising reasonable business prudence would be justified in improving real estate in that vicinity with a modern fire-proof steel building under a 99-year lease containing a ten-year re-valuation clause. The witnesses for plaintiffs in error stated that in their judgment such a lease amounted to substantially the same thing as a ten-year lease and was worth from ten to twenty-five per cent less than if such re-valuation clause were omitted; that it would be impossible to make a loan of any substantial amount to put up a modern fire-proof building under such a lease, as the mortgage would be practically a second mortgage and the lien of the rents under the lease would be a first mortgage, uncertain in amount and liable to increase with each re-valuation. On the other hand, two of the witnesses for defendant in error testified that in their judgment the ten-year re-valuation clause would not greatly affect the value of the leases; that while it was difficult to make a loan on a 99-year lease, and perhaps more difficult with a re-valuation clause, it would not be impossible to get a loan in either case. It appears, however, that none of the witnesses had practical experience in negotiating loans on 99-year leases with re-valuation clauses, and their testimony on this point was based on their general experience in handling down-town real estate and in making loans. The evidence shows that two lots under the north end of the Auditorium, larger in size than two of these lots, have been improved with a modern fire-proof steel building although under long-term leases with re-valuation clauses. It was the re-valuation under these last mentioned leases that was litigated in *Chicago Auditorium Ass'n* v. *Fine Arts Building, supra.* There is evidence tending to show that a loan was made on the

Auditorium building at the time it was constructed, and also that some of the lots under the Fair building, in Chicago, are on long-term leases with re-valuation clauses. Manifestly, there has been very little opportunity to find out by experience since 1897 the effect of a re-valuation clause upon the erection of such buildings or the rental value of the land.

This court held in *Springer* v. *Borden,* 210 Ill. 518, where a lease with a re-valuation clause had twenty years yet to run, that the appraisers, in finding "the cash value of said demised premises, exclusive of the buildings and improvements thereon," should find simply the cash value of the naked lot with a clear title in fee simple, without considering the appreciation or depreciation which the existence of a lease might have upon the value. Did the parties to these leases, by the above quoted provisions of the supplemental lease, which give the appraisers the right to take into account, if they think it pertinent, the improvements, character, condition, etc., intend that they should consider the effect of the lease upon the value of the land?

It is apparent that the market value of land in the loop district is not fixed and certain; that the advance in values in that district in the last fifteen or twenty years has been so rapid that it is largely guesswork and speculation as to what the further advances will be. The evidence, we think, shows clearly that a ten-year re-valuation clause in a long-term lease would not be beneficial to the lessee. It seems to be assumed by counsel for both parties that even though not advantageous to the lessee it would be to the owner. Provisions in a lease, especially on property similar to that here involved, that would be ruinous to the lessee, in the long run might not be advantageous to the owner of the land, for if the lessee became bankrupt by the onerous provisions in the lease the lessor would not be able to collect his rents, and would thereby be compelled to make a new lease on terms fair to both parties or put the land to some

other use.  By the sixth section of the supplemental lease
it was intended that the appraisers might take into consid-
eration the terms of the lease if in their judgment such
terms had an effect on the actual value of the land, the
terms of the lease, however, being only one of the many
elements which should be considered in determining its true
cash value.  From this record it is apparent that experi-
enced men differ as to the effect of leasehold interests of this
character on the value of land.  The appraisers should take
into consideration all the elements they think enter into a
determination of the true cash value of the land.  The con-
clusion we have reached as to the proper construction of
this lease is in accord with the holdings of this court in
*City of Chicago* v. *Tribune Co.* 248 Ill. 242.

The evidence in this record shows that each tract of
two lots under these leases paid in 1880 $2735 annual
rent, and that for the ten years following 1895 one of these
tracts was to pay $11,400 annual rent and the other $11,-
220,—that is, the rental value of these tracts had fairly in-
creased in fifteen years more than fourfold.  The original
bills of complaint asked to have the entire appraisement set
aside, which, under the leases, would leave the rental from
1905 to 1915 the same as for the previous ten years.  Coun-
sel for plaintiffs in error, however, do not contend for that
position in this court.  They argue, only, that the value
fixed by the chancellor should be upheld by this court, leav-
ing the annual rental at $17,280 for the years from 1905
to 1915 for the Sebree tract and the same for the Farwell
tract.  While we are disposed to hold that the rental values,
under the compromise leases made by the board of educa-
tion, were not properly in evidence as they were the result
of compromise, it may be remarked, in passing, that if
the square-foot valuations in those leases be added to the
square-foot valuations of all the other sales and leases
shown in this record and an average struck, such average
would be approximately the square-foot valuation placed

upon these lots by the appraisers. Most of the leases made by the board of education and introduced by the plaintiffs in error were made before 1900, and the conditions were then changing so rapidly within the loop district of Chicago, as is readily seen from the admitted advance of the property here in question, that five years would make a marked difference in the fair cash value of any of the lots.

It appears from the record here that in 1904 the plaintiff in error Sebree bought his lease and paid a bonus of $85,000, and that, a short time before, the former owner had been offered a bonus of $70,000, and afterwards $80,000, and refused both offers. Clearly, at that time the re-valuation clause in the Sebree lease was not considered as making the lease valueless. It is plain that neither the price nor the actual worth of one piece of property can be held decisive as to the value of another piece, even though in the same vicinity. The evidence shows that corner property is generally more valuable than that in the center of a block. The question of location, light and air, and many other elements, must be considered in determining the fair cash value. Several witnesses testified that in the loop district the property on one street was worth twice as much as on the next street in the corresponding block, and that properties situated across the street from one another might differ very greatly in value. These two pieces of property, considering the opportunities for light and air, and many other advantages, are quite favorably situated for the erection of a building to get a large rental, as compared with other inside lots in the loop district containing an equal number of square feet.

Real estate experts differ greatly in their estimates as to the value of this property and other real estate in the vicinity. Three of the experts, on this hearing, placed the value of this property far below that placed upon it by the appraisers. The other three experts placed it far above the appraisers' estimate. Judged by the qualifications shown on

this record, the three experts who testified for defendant in error were men of as great experience in real estate matters, and as well qualified to testify as to values, as were the experts for the plaintiffs in error. The good faith of the appraisers or their qualifications for this work are not challenged. It is only asserted that they were so biased in favor of defendant in error that they unconsciously appraised the property higher than its real value. No attempt was made to show any bias as to Judge Waterman, except that he had received all his pay from the board of education. Assuming, for the purposes of the argument, that the experts were biased because of so receiving their pay, there is no ground in this record to conclude that they were more biased than were the three experts who testified for plaintiffs in error. If, then, the court were to reach a conclusion as to values based on the evidence of the expert witnesses and the finding of the appraisers, we would have the finding of three appraisers upheld by the even higher estimates of three expert witnesses, as opposed to the lower estimates of three other expert witnesses.

We have not attempted to set out in detail all the evidence in the record as to the valuation of these properties or the reasons advanced by the various witnesses why one piece in that locality should be more valuable than another. We deem it sufficient to say, that after a full consideration of this record, including a consideration of the provisions of the leases, having in mind the very important and large interests involved in the proper construction of these leases, if it were conceded that the appraisements must be held invalid because of the bias of the appraisers and we were called upon to fix the values, we would be compelled to hold that the values of these two tracts as fixed by the appraisers were supported by the weight of the evidence. In our judgment, however, the appraisements made of these two properties by the three appraisers were not shown to be invalid. There is no evidence properly in this record

that tends to show what elements of value were considered by them in reaching their conclusions. Under the reasoning of this court in *Chicago Auditorium Ass'n* v. *Fine Arts Building, supra,* and other authorities herein cited, we can not hold, on the facts in this case, that the findings of the appraisers were invalid. We do not regard the valuations fixed by them as furnishing any basis for inference that they were improperly influenced in arriving at their conclusions.

The judgment of the Appellate Court must therefore be affirmed.      *Judgment affirmed.*