(Nos. 29722-3-4-5.—

BLANCHE S. GIDDENS *et al.*, Appellants, *vs.* BOARD OF EDUCATION OF THE CITY OF CHICAGO, Appellee.

*Opinion filed Sept. 18, 1947—Rehearing denied November 17, 1947.*

Downer McCord, Thomas Hart Fisher, D'Ancona, Pflaum, Wyatt, Marwick & Riskind, and Kirkland, Fleming, Green, Martin & Ellis, (William Wilson, and Joseph H. Pleck, of counsel,) all of Chicago, for appellants.

Richard S. Folsom, Frank S. Righeimer, and Hummer, Van Ness & Yowell, (Laurence R. Van Ness, of counsel,) all of Chicago, for appellee.

Mr. Justice Wilson delivered the opinion of the court:

By four separate actions in equity brought in the circuit court of Cook County, the ground tenants of six lots owned by the Board of Education of the city of Chicago, sought to set aside the decennial appraisal of the properties, made May 8, 1935, for the purpose of fixing rents for the ensuing ten years, pursuant to the terms of the leases, and to enjoin the defendant, the Board of Education, from declaring a forfeiture of the leases. The chancellor, after hearing the evidence, found against the plaintiffs and, in each cause, a decree was entered dismissing the complaint for want of equity. Upon appeals prosecuted to the Appel-

late Court for the First District, the decrees in favor of the Board of Education were affirmed. (*Giddens* v. *Board of Education,* 328 Ill. App 588.) We have granted four separate petitions for leave to appeal, and the appeals have been consolidated for consideration and opinion.

The properties involved are lots 3, 7, 31, 32, 33 and 34 in block 142, School Section Addition to Chicago. All are located on the west side of State street between Madison and Monroe streets in the heart of Chicago's main retail business district. Each is an inside lot with a frontage of 24 feet and a depth of 120 feet. In May, 1935, the improvements ranged from an old, run-down, six-story, nonfireproof structure on lot 7 to a comparatively new and modern, seven-story, fireproof building occupying lots 31 and 32. The facilities of the respective premises are devoted exclusively to retail merchandising, their most economic use.

The various plaintiffs are remote assignees of lessees under ground leases executed May 8, 1880, as modified by supplemental leases dated June 15, 1888. The leases of 1880 provided for a term of fifty years and included a stipulated rental for the first five years. For each succeeding five-year period, the annual rental was fixed at six per cent of the "true cash value" of the lots as determined at quinquennial appraisements to be made by three appraisers appointed by the Board of Education. The appraisement of May 8, 1885, resulted in litigation instituted by the lessees which was subsequently compromised in 1888 by the execution of supplemental leases. By the modifications incorporated in the supplemental leases, the term of the leases was extended to May 8, 1985, the interval between appraisals was increased from five to ten years and, of the three appraisers, only one, the chairman, was to be appointed by the Board of Education, the other two to be appointed by the judge of the Circuit Court (now District Court) of the United States, Northern Dis-

trict of Illinois, and the judge of the probate court of Cook County, respectively. The first appraisal under the supplemental leases was made May 8, 1895. All decennial appraisals have resulted in litigation. 1895—*Board of Education* v. *Frank*, 64 Ill. App. 367; 1905—*Sebree* v. *Board of Education*, 254 Ill. 438, and *Rosenthal* v. *Board of Education*, 270 Ill. 380; 1915—*Collins* v. *McVickers Theater Co.* 207 Ill. App. 240; 1925—*Union Trust Co.* v. *Board of Education*, 348 Ill. 256, and *Board of Education* v. *Beck*, 293 Ill. App. 630; 1935—*Giddens* v. *Board of Education*, 328 Ill. App. 588.

In respect to the qualifications of the appraisers, the leases provide that each person so appointed shall be a "discreet male resident of the city of Chicago, not interested as lessee or mortgagee of school property," and they shall "at all times and under all circumstances be held to be appraisers and not arbitrators." Each supplemental lease declares, "it is not the purpose of this instrument that the persons appointed as appraisers hereunder, or either of them, shall be the representatives of either of the parties hereto." While the ground tenants have no voice in the selection of the appraisers, they must be notified by mail of the appointment and thereupon they have thirty days within which to file written objections to the appointment or qualifications of the appraisers.

According to the leases, the single function of the appraisers is "to determine under oath first duly taken, the true cash value of said demised land at the time of such appraisal, exclusive of the improvements thereon." Both the lessees and the Board of Education are granted the opportunity to file written statements or arguments "to present to the appraisers information within their possession and their views concerning the value of the demised land." As related, however, under no circumstances shall the appraisers be considered arbitrators. Specific provision is found in the supplemental leases that, with certain ex-

ceptions, they shall not be bound to give notice of their meeting or proceedings to the parties. In their determinations, the appraisers enjoy an almost unlimited discretion. They "shall not be concluded in any event by the statements so made, but shall be at liberty to seek or obtain such information as they deem pertinent either with or without notice to the parties, and to make their appraisal upon all facts within their knowledge, notwithstanding anything contained in the said written statements." The appraisers may even "take into consideration if and so far as they deem it pertinent to do so, the improvements on such land and the character, condition, value, cost, rental expenses and other particulars thereof, and any other facts or information from whatever source bearing upon the question of the actual value of said land."

Early in 1935, George A. Carpenter, Paul Steinbrecher and Wallace G. Clark were appointed appraisers. A former judge of the United States District Court, George A. Carpenter, was appointed by the Board of Education and became chairman of the board of appraisers, as contemplated by the leases. Steinbrecher and Clark, both real estate men, were appointed by Hon. James H. Wilkerson, then senior judge of the District Court of the United States, Northern District of Illinois, and the judge of the probate court of Cook county, respectively. To the appointment of Steinbrecher and Clark, the lessees filed timely objections upon the ground that both were disqualified. Applications for the appointment of substitute appraisers were heard before the respective appointing judges and denied. The appraisers then proceeded to establish the true cash value of the school fund properties as of May 8, 1935. In due time, the valuations were reported, the lots in question being valued at approximately five hundred thousand dollars each. To their original objections that the appraisers were disqualified, the lessees added the charge that the valuations were excessive. No adjustment of the ap-

praisal was made, and the Board of Education threatening forfeiture of the leases, the lessees filed their respective actions in the circuit court of Cook county to set aside the appraisal.

As grounds for reversal of the judgments of the Appellate Court affirming the decrees dismissing the complaints, plaintiffs contend (1) that Clark and Steinbrecher were disqualified to act as appraisers by reason of bias and prejudice and (2) that either through bias and prejudice or fundamental mistake of the appraisers the values reported are grossly excessive and totally at variance with the uncontroverted facts. The alleged bias and prejudice of Clark stems from a partnership association of over forty years' duration with J. Milton Trainer; that of Steinbrecher arises from his appointment as one of the three appraisers in the 1925 revaluation of the school board's properties.

The pertinent facts are not in dispute. In both the appraisement of 1925 and the protracted litigation which ensued Trainer appeared as a valuation witness for the Board of Education. Trainer prepared most of his data in the office of Clark and Trainer, was assisted by the firm's office staff and frequently conferred with Clark. The hearings before the master in the second and last phase of the 1925 contest were not concluded until June, 1934, when Trainer rendered a bill for $15,000 covering the total of services as expert witness in the 1925 appraisement and in all the subsequent litigation. Trainer's fee was not paid by the Board of Education until 1936. In the interim, Trainer's partner, Clark, who was to share in the fee equally with Trainer, pursuant to the partnership agreement, was appointed one of the 1935 appraisers. Plaintiffs also point out that, on June 22, 1934, Trainer was employed by the Reconstruction Finance Corporation to make an appraisal of all school board properties in connection with the Board of Education's application for

a loan of $22,000,000. The other appraiser for the Reconstruction Finance Corporation was Fred J. Tucker, an expert witness for the Board of Education in the 1925 case and the sole school board witness to appear before the 1935 appraisers. Again, the appraisal data was assembled in Clark and Trainer's office, Trainer discussed the appraisals with Clark, and Trainer's fee was credited to partnership profits. The Trainer-Tucker appraisal reports were completed in October, 1934, and, four months later, Trainer's partner, Clark, was appointed to participate in the 1935 appraisement. In addition to the circumstance that Clark was to share equally with Trainer in partnership profits accruing from Trainer's fee from the Board of Education, the lessees argue that Clark could not, without embarrassment, concur in a valuation as of May 8, 1935, substantially at variance with his partner's appraisal of the same properties in October, 1934. The lessees further assert Clark could not give fair and impartial consideration to the lessees' contention that the outmoded leases result in a twenty-per-cent reduction in the value of the lots when this contention had been opposed by Trainer in the 1925 proceedings.

Facts relating to the alleged disqualification of Steinbrecher are more simply stated. The evidence discloses that he was one of the three appraisers appointed in 1925; that, in the subsequent litigation, the lessees charged him with everything from capriciousness to fraud, and that the lessees have refused to pay their half of the $10,000 fee he charged for his work in the 1925 appraisal. The argument as to Steinbrecher's disqualification is grounded on the prejudice presumably engendered against the lessees by their own refusal to pay their agreed share of the cost of the 1925 appraisement.

Aside from the values fixed by a concurrence of all three appraisers, the lessees do not ascribe any acts or words of prejudice to Clark or Steinbrecher. Indeed,

Judge Carpenter, chairman of the board of appraisers and an experienced jurist of unquestioned integrity, testified that, in all the numerous hearings and conferences held during the appraisement, he did not observe any signs of bias or prejudice in either of his two colleagues. The question thus presented for determination is whether, upon the facts related, Clark and Steinbrecher were, at the time of their appointment, disqualified to act as appraisers. The issue is governed by the terms of the leases, taken in conjunction with the general law relating to the disqualification of appraisers. The leases, both original and supplemental, require only that the appraisers shall be discreet male residents of the city of Chicago, not interested as lessees or mortagagees of school property, and that they shall not be representatives of the parties. Certainly, Clark and Steinbrecher meet all the prerequisite qualifications specifically provided for by the leases. Nevertheless, notwithstanding the failure to incorporate in the leases a broad provision commanding that the appraisers shall be disinterested and impartial, it is undoubtedly true that, in addition to an interest as lessee or mortgagee of school fund property or being a representative of one of the parties, other circumstances exist which will subject an appraiser to disqualification. We do not, however, deem Clark's partnership with Trainer and Steinbrecher's claim against the lessees for his 1925 appraisal fee sufficient grounds for holding that they were disqualified from acting as appraisers.

In the first place, not only did Clark and Steinbrecher satisfy all the specific qualification requirements established by the leases, but they were otherwise exceptionally well qualified to act as appraisers. The evidence discloses that both men had been engaged in the real estate business in downtown Chicago for many years and each had a vast experience in buying, selling, managing and appraising valuable properties located in the central business district.

Secondly, the appraisers here under attack were not appointed by the Board of Education but, instead, by totally disinterested third persons, the senior judge of the United States District Court and the judge of the probate court of Cook county, the original lessees having placed their trust and confidence in the impartiality of the holders of these offices as is evidenced by the incorporation of this appointment procedure in the supplemental leases of 1888. In this connection, it is interesting to note that, although the plaintiffs have successively charged Clark and Steinbrecher with bias and prejudice before the appointing judges, in the trial court and in the Appellate Court, they have failed to persuade a single judge that the appraisers were disqualified. A third consideration is the fact Clark had never had any employment or other relations with the school board prior to his appointment. As to Steinbrecher, the lessees are, of course, solely responsible for their own failure to pay their share of the fee for the 1925 appraisal. Furthermore, Clark's partner, Trainer, was individually employed by the Board of Education, his work as expert witness was completed on June 12, 1934, eight months prior to Clark's appointment, and his employment related exclusively to the valuation of the lots as of May 8, 1925, the 1935 appraisement being totally foreign to his duties. In the appraisal reported by Trainer and Tucker in October, 1934, Trainer, being retained by the prospective mortgagee, represented an interest adverse to the Board of Education. It is not without significance that the values ascribed to the lots by Clark in 1935 were even lower than those reported by Trainer in 1934.

A review of the authorities touching on the qualifications of arbitrators and appraisers, although not in complete accord, fully confirms the decision that Clark and Steinbrecher were qualified to perform the duties of appraisers. The mere fact that an appraiser is a creditor or possible creditor of one of the parties is not sufficient

to disqualify him. (*Bullman* v. *North British & Mercantile Insurance Co.* 159 Mass. 118; *Mather* v. *Day,* 106 Mich. 371.) Where an appraiser and a lessor had been friends for fifteen years, had formerly been partners, owned stock in the same corporations, and where the appraiser had testified in behalf of the lessor in several lawsuits, the appraiser was not disqualified to serve on a board chosen to fix rentals, pursuant to the terms of a lease. (*Johnson* v. *Korn,* 117 S.W. 2d 514.) The mere fact that an appraiser has served in previous appraisements involving one of the parties is not inconsistent with his impartiality. (*Firemen's Fund Insurance Co.* v. *Flint Hosiery Mills,* 74 Fed. 2d 533; *Young* v. *New York Underwriters Insurance Co.* 207 N. C. 188; *Continental Insurance Co.* v. *Vallandingham,* 116 Ky. 287.) Prior employment as an attorney for the party in whose favor the award was made has been held insufficient to establish incompetency. (*Goodrich* v. *Hulbert,* 123 Mass. 190.) Where the relationship between the arbitrator and one of the parties was that of landlord and tenant, the award was sustained. (*Fisher* v. *Towner,* 14 Conn. 26.) Where an architect was designated as arbitrator in a construction contract and he made an award in favor of the owner, the fact that he had previously appeared as a witness for the owner in litigation involving the same dispute did not disqualify him from acting as arbitrator. (*Barclay* v. *Deckerhoof,* 171 Pa. 378.) The cases are cited, not necessarily in approval of the holding in each instance, but to indicate the trend of judicial decision which looks with disfavor upon attacks of this character, unless bottomed upon very substantial grounds. Not to be overlooked are decisions in Illinois involving earlier appraisements under the same school board leases now once again before us. Payment of the appraiser's fees by the Board of Education alone, accompanied by the fact that the appraisers, at the request of the president of the Board of Education, appraised two

pieces of property which were not school board property, has been held not to disqualify the appraisers. (*Sebree* v. *Board of Education*, 254 Ill. 438.) Again, an appraisement has been sustained regardless of the circumstance that the appraiser appointed by the Board of Education was formerly a member of the Board of Education, and its president, and had been actively identified with its interests for a long time. *Board of Education* v. *Frank*, 64 Ill. App. 367.

While it is evident from an examination of the authorities that all do not agree as to the particular grounds which are sufficient to disqualify arbitrators and appraisers, two propositions may be deduced. First, each case must, in a large measure, be governed by its own circumstances and, second, an interest or bias to disqualify may be small, but it must be direct, definite and capable of demonstration, rather than remote, uncertain or speculative. The facts and circumstances existing in the case at bar impel the conclusion that whatever interest Clark and Steinbrecher had in the valuations reported by the board of appraisers, it was indirect, remote and uncertain and, consequently, insufficient to require disqualification. The cases relied upon by the plaintiffs are, for the most part, inapplicable and do not necessitate a contrary result. Only two relate to appraisements and both are distinguishable. In *Schwartzman* v. *London & Lancashire Fire Insurance Co.* 318 Mo. 1089, the umpire appointed by the court, pursuant to the terms of an insurance policy, was held to be disqualified by virtue of the fact that, after he was appointed and before he took oath as an appraiser, the company of which he was secretary, treasurer and stockholder, was, to all intents and purposes, appointed an agent of one of the insurance companies involved. *Coon* v. *National Fire Insurance Co. of Hartford*, 213 N.Y.S. 407, affirmed without opinion, 246 N.Y. 594, also concerned an appraisement under an insurance policy. The appraiser, there

disqualified, had been appointed by the insurer, the insurer having represented that its "competent and disinterested" appraiser was a contractor and builder, whereas, in truth, he was a professional appraiser and had represented insurance companies and adjustment bureaus in over five hundred appraisals.

From the charge of disqualification leveled at Clark and Steinbrecher, plaintiffs turn to an attack on the appraisement itself. The 1935 values, both as reported by the appraisers and as advocated by the lessees, together with the results of all prior decennial appraisements, are set forth in the following table:

| Lot | 1895 | 1905 | 1915 | 1925 | Appraisers 1935 | Lessees 1935 |
|---|---|---|---|---|---|---|
| 3 | $160,000 | $360,000 | $322,560 | $604,800 | $525,600 | $297,216 |
| 7 | 150,000 | 312,000 | 322,560 | 576,000 | 496,800 | 276,480 |
| 31 | 165,000 | } 636,000 { | 334,080 | 604,800 | 525,600 | 290,304 |
| 32 | 150,000 | | 322,560 | 576,000 | 496,800 | 276,480 |
| 33 | 150,000 | 300,000 | 322,560 | 576,000 | 496,800 | 276,480 |
| 34 | 150,000 | 288,000 | 322,560 | 576,000 | 496,800 | 276,480 |

According to the lessees, then, the true cash value of the lots had depreciated more than fifty per cent between 1925 and 1935, and had, in fact, receded to the levels existing around 1900. The large reduction in the value of the school board lots is ascribed principally to the last great economic depression and to the depreciating influence of the revaluation clause of the leases, a factor not taken into consideration in the 1925 revaluation. *Board of Education* v. *Beck,* 293 Ill. App. 630.

The applicable general rule is that the findings of appraisers are conclusive on the parties in the absence of fraud or mistake and will not be set aside merely because the valuations appear too high. (*Sebree* v. *Board of Education,* 254 Ill. 438.) Plaintiffs charge both fraud and mistake. They contend that the values reported are so grossly excessive as to constitute fraud, either actual or constructive, and that, in any event, the appraisers mis-

conceived their duties and acted upon a fundamental mistake. Parenthetically, it may be noted that plaintiffs' brief exhibits no serious effort to make the purported proof of over-valuation stand as additional evidence substantiating the alleged bias and prejudice of Clark and Steinbrecher and, in our view of the validity of the appraisement, this potential issue drops from the case.

The questions thus raised by plaintiffs are primarily factual in character and, having been decided adversely to them by the chancellor, in the first instance, and by the Appellate Court upon review, the decrees refusing to set aside the appraisement cannot be reversed, unless contrary to the manifest weight of the evidence. What actually transpired in the minds of the appraisers, the sales, rentals, and other circumstances considered by them, the weight ascribed to each fact, the methods and factors employed in computing the reported valuations,—all this is unknown and cannot be ascertained. At the hearings held by the appraisers, the Board of Education advocated values averaging slightly in excess of $500,000 per lot, while the lessees argued for the values set forth in the above table, and both sides introduced much evidence in support of their respective contentions. The appraisers, however, were not limited in their deliberations to matters of record but were free, pursuant to the specific provision of the leases, to draw upon their own knowledge and experience and to conduct an independent inquiry seeking any information they deemed pertinent. Consequently, no one except the appraisers themselves knows the actual basis on which the values were determined. At the hearing before the chancellor, the plaintiffs introduced testimony and exhibits, constituting the greater part of the eighteen-volume record, purporting to show the values fixed were so greatly in excess of the true cash values that the appraisers must have been guilty of fraud or mistake. The proofs submitted by the Board of Education purported to show how

the appraisers could have reasonably and logically arrived at the values which they reported. No useful purpose would be served by recounting the testimony in this particularly voluminous record. Summarizing briefly, however, plaintiffs' testimony tended to demonstrate the decentralization of retail merchandising in Chicago and showed a reduction in rentals of certain State street properties and other properties in the central business district in excess of forty per cent between 1925 and 1935, a large decline in both the net sales volume and the advertising lineage of State street department stores, the collapse of 111 long-term leaseholds in the downtown district during the same period, and the sales of two or three properties in the business districts at prices between forty and fifty per cent below 1925 values.

In support of the values reported by the appraisers, witnesses for the Board of Education testified that the value of the lots in question increased approximately fifty per cent between 1925 and 1928 and that, while the appraisers' values are only thirteen per cent below the 1925 figures, they are at least forty per cent below 1928 values. The evidence further shows that in 1934 and 1935 the lessees of lots 3, 7, 31 and 32 negotiated leases with subtenants calling for annual minimum rentals ranging between $40,000 and $50,000. Each lease provided for additional rental based on stated percentages of annual gross sales in excess of specified figures. In addition, there was competent testimony that each of the lots would have brought an annual rental of approximately $50,000 if it had been improved with a modern four-story building having a selling basement and designed for use by a single occupant as a retail store. It was demonstrated that, of an annual gross rental of $46,000, $30,330 would be properly attributable to the land and that, capitalized at six per cent, the income from the land would indicate a valuation of about $505,000. Many of the transactions relied upon by plain-

tiffs were very properly attacked on the ground that they did not involve comparable State street properties, or that they were out of line with other State street rentals, or were affected by peculiar circumstances. The chancellor found that there was no fraud or mistake on the part of the appraisers and stated that, upon the testimony heard and the many exhibits introduced in evidence, in his opinion, the values established by the appraisers were correct. Upon the record thus made, we see no valid reason for disturbing the findings of the chancellor.

Plaintiffs are particularly persistent in their contention that the outmoded provisions of the leases, especially the revaluation clause, depreciate the value of the lots by approximately twenty per cent, that a duty rests upon the appraisers to take this fact into consideration in fixing the values, and that the failure of the appraisers to give effect to the depreciating influence of the leases constitutes a mistake of sufficient magnitude to nullify the appraisement. The argument advanced is at war with both the law and the facts. As plainly stated in *Springer* v. *Borden,* 210 Ill. 519, where a lease provides that the rental shall be a stated percentage of the cash value of the premises exclusive of improvements, the cash value means the fair cash market value of the naked lot, with a clear title in fee simple, and without the appreciation or depreciation which the existence of a lease might have upon the value. The decision does not, of course, preclude the parties to a lease containing a revaluation clause from executing an agreement permitting or directing the appraisers to consider the effect of the lease itself upon the value of the land.

By the sixth section of the supplemental leases of 1888, it is provided that "notwithstanding anything in said lease contained, the appraisers shall be at liberty, in forming their judgment of the value of the land without including the value of the improvements thereon, to take into con-

sideration, if and so far as they deem it pertinent to do so, the improvements on such land, and the character, condition, value, cost, rental, expenses and other particulars thereof, and any other facts or information from whatever source, bearing upon the question of the actual value of the land." In the litigation following the 1905 appraisal, (*Sebree* v. *Board of Education,* 254 Ill. 438,) this court held it was intended by the quoted provision of the supplemental lease that the appraisers might take into consideration the terms of the lease if, in their judgment, the terms had an effect on the actual value of the land. The appraisement was sustained against the charges that the leases depressed the value of the property and that the appraisers were duty bound to consider such circumstance, the court observing it was abundantly apparent from the record that experienced real-estate men differ as to the effect of leases of this character on the value of land. It is thus perceived the *Sebree case* does no more than establish the proposition that the school board appraisers are at liberty to consider the effect of the leases in determining the value of the lots. There is no requirement that the appraisers must, in all events, consider the effect of the leases.

Since the decision in the *Sebree case* the issue of the depreciating effect of the provisions of the leases has twice been before the Appellate Court. In the only instance in which the Board of Education sought to set aside a decennial revaluation, the board attacked the 1915 appraisement upon the ground that the appraisers had deducted twenty per cent from the fair cash value because of a purported depreciating effect on the value of the lots. A demurrer to the complaint was sustained, the Appellate Court holding that the effect of the leases was a matter for the appraisers to decide under the authority of the *Sebree case.* (*Collins* v. *McVickers Theater Co.* 207 Ill. App. 240.) In *Union Trust Co.* v. *Board of Education,*

348 Ill. 256, the 1925 appraisement was held invalid and the cause remanded, with directions for the court to hear evidence and to determine the true cash value of the lots. In establishing the value of the several lots the chancellor found that the leases depreciated the value by approximately twenty per cent. In a well-considered opinion, the Appellate Court held that the finding as to the depreciating effect of the leases was contrary to the manifest weight of the evidence. The decrees were reversed and the causes remanded, with directions to find the fair cash value of the lots to be certain stated amounts, which were the same values as reported by the appraisers in the first instance. (*Board of Education* v. *Beck,* 293 Ill. App. 630.) We denied lessees' petition for leave to appeal.

In the case at bar, the evidence discloses that the appraisal report submitted by the appraisers specifically recites that they considered the effect of the leases on the value of the property and this is confirmed by the testimony given by Steinbrecher at the hearing before the chancellor. In addition, both the chancellor and the Appellate Court held that the leases did not depreciate the value of these State street lots. It thus appears that the appraisers were at liberty to consider the effect, if any, of the provisions of the leases on the value of the land, that they did take the leases into consideration in making their valuations, and that the factual question as to whether the leases have a depreciating effect has been decided adversely to the plaintiffs in both the trial court and in the Appellate Court. Plaintiffs' contentions with respect to the depreciating effect of the leases are without any basis whatsoever, either in law or in fact, and must be resolved against them.

The judgments of the Appellate Court are affirmed.

*Judgments affirmed.*