CAMPBELL v. MICHIGAN MUTUAL HAIL INSURANCE CO.

1. INSURANCE—ARBITRATION AND AWARD—HAIL INSURANCE — CONSTRUCTIVE FRAUD—SETTING ASIDE AWARD.

Where it appeared, in a suit by insured against a mutual hail insurance company to set aside an award of arbitrators of no loss, that the provisions in the articles of association and by-laws of insurer as to requirements and restrictions on the arbitration procedure were not observed in the instant case, the award was properly set aside as void.

2. SAME—HAIL INSURANCE—EVIDENCE—DAMAGES.

In determining the loss on a crop of growing peas caused by hail, comparison with a crop grown nine or ten miles away, which was uninjured, was competent, where none were grown nearer, both crops were of the same kind of peas, and were planted under like conditions and under the same supervision.

3. SAME — MUTUAL INSURANCE ASSOCIATIONS — ARBITRATION AND AWARD—CONSTRUCTIVE FRAUD—BY-LAWS.

In a suit against a mutual hail insurance company to set aside an award by arbitrators of no loss, and to determine the amount of loss sustained under the policy, where the award was constructively fraudulent under the facts shown and was in violation of insurer's by-laws, the decree of the court below holding the award void was justified.

4. ARBITRATION AND AWARD — ARBITRATION AND APPRAISAL DISTINGUISHED.

There is a broad distinction between a submission to arbitration and the reference of a collateral or incidental matter of appraisement, measurement, or calculation; the theory of arbitration being that it is a substitute for a proceeding in court, while appraisers are not required to have hearings or take evidence or even receive the statements of the parties, but as long as they act honestly and in good faith they have a wide discretion as to their methods of procedure and sources of information.

[1]Insurance, 33 C. J. § 699; [2]Hail Insurance, 29 C. J. § 11; [3]Id., 29 C. J. § 11 (Anno); [4]Arbitration, 5 C. J. §§ 1, 4; 4 A. L. R. 1298; 7 A. L. R. 373; 35 A. L. R. 267; 14 R. C. L. 1320; 3 R. C. L. Supp. 382; 6 R. C. L. Supp. 883.

5. INSURANCE—MUTUAL INSURANCE ASSOCIATIONS—BY-LAWS BINDING ONLY WHEN WITHIN SCOPE OF STATUTE.

By-laws are only binding on members when made within the scope of the authority given the company by the statute under which it is organized and its authorized articles of association.

6. SAME—HAIL INSURANCE—LIMITATION OF LIABILITY NOT AUTHORIZED BY STATUTE VOID.

A by-law of a mutual hail insurance company, limiting its liability to insured's *pro rata* share of a three per cent. assessment on policyholders in insured's class, made a part of the policy, is void, where the statute (2 Comp. Laws 1915, § 9743 *et seq.*) under which it was organized does not authorize its adoption, and insured, who had not received his policy at the time of the loss, had no notice of any such provision, but understood he was insured for the amount stated in the policy.

Appeal from Jackson; Parkinson (James A.), J. Submitted April 29, 1926. (Docket No. 121.) Decided October 3, 1927.

Bill by Ray Campbell against the Michigan Mutual Hail Insurance Company to set aside an award on the ground of fraud, and to determine the amount of loss sustained under the terms of a policy of insurance. From a decree for plaintiff, defendant appeals. Affirmed.

*Cobb, Bisbee & Wilson* (*Kinnane & Leibrand*, of counsel), for plaintiff.

*Elmer N. Peters* and *Rosslyn L. Sowers*, for defendant.

STEERE, J. Plaintiff is a farmer by vocation, owning, tilling, and residing upon his farm located in Parma township, Jackson county. In the spring of 1923 he planted 100 acres of his farm to peas, and on

[6]Insurance, 32 C. J. § 70; [6]Hail Insurance, 29 C. J. § 11 (Anno); 2 R. C. L. 379; 1 R. C. L. Supp. 516; 6 R. C. L. Supp. 92.

June 5th of that year insured the crop, which was approaching maturity, against loss or damage by hail to the amount of $4,000 with the defendant Michigan Mutual Hail Insurance Company, a corporation organized under the laws of this State.

On June 7, 1923, a hailstorm passed over his farm, and, as he claimed, seriously injured his crop of peas. On that date he reported his loss by telephone to defendant's secretary, Garber, and on June 10th defendant's president, Milbourn, went as its adjuster to plaintiff's place to adjust the loss. He testified that he looked at the fields of peas, went into the crop some 20 or 30 rods and made his final conclusion that he would report no liability; that he came to such conclusion before he saw plaintiff at all and without hearing any evidence from anybody; that he saw plaintiff, talked with him about it and told him he could not see any damage. In his talk with plaintiff he asked if anyone had seen the crop since it was struck by the storm, and plaintiff told him that three men, named Hunn, King, and Peckham had been there. Peckham lived at the village of Parma and was defendant's agent who took plaintiff's application for this insurance. Plaintiff told Milbourn that Peckham had said he did not believe any damage was done to the peas by the hail as the insides of blossoms cut off were left and would develop pods, while Hunn and King thought there had been considerable damage done. Milbourn then said he would talk with the three men plaintiff had named, and left. He saw Peckham and talked to him about the matter, said he inquired for Hunn and King but was told one had taken the car toward Jackson and the other was out at his farm, so he didn't see either of them.

The next information upon the subject which came to plaintiff was a letter from defendant stating it had been determined there was no damage done to his

crop.     Plaintiff promptly answered expressing dissatisfaction, and asked for an arbitration.     On June 16, 1923, defendant's secretary wrote plaintiff that the arbitrators would be at his farm on June 22, 1923. The three arbitrators named by defendant were Donovan, Hending, and Andrews.     Plaintiff was at home on his farm that day.     Hending and Andrews were met at the village of Parma, about three miles from plaintiff's farm, by defendant's president and secretary. The four went to the store of defendant's agent, Peckham, where the subject was discussed and apparently prejudged by them.     Peckham and Milbourn told the two arbitrators who were with them that there had not been any loss so far as they could see.     Peckham testified:

"That was the general talk between us.     In the presence of these arbitrators they all agreed on the proposition as I viewed it, that there was no loss.
     "*The Court:* There was no loss and they talked that?
     "*A.* Yes.     *     *     *     I don't know whether they had been out or not.     I remember Mr. Milbourn expressed the opinion there was no loss.     It was the general talk.
     "*The Court:* Did any one oppose that view?
     "*A.* No."

The two arbitrators, Andrews and Hending, testified that they also went and interviewed Hunn and King, whom they were told had seen the pea crop after the storm, but were silent as to what they learned from them.     Donovan was not with them at that time but came to plaintiff's farm in the forenoon from another direction.     He told plaintiff why he had come there and was shown the pea fields.     He looked them over, remained there waiting for the others, and had dinner with plaintiff.     In the afternoon Milbourn, Garber, and the other two arbitrators came in an automobile. Milbourn and Garber soon drove away, leaving the

three arbitrators there. After viewing the crops they came back to the house and Milbourn and Garber also returned. They discussed the matter with plaintiff and asked him his opinion as to the damages. In the discussion he told about the hailstorm, and said to them that, inasmuch as his damages exceeded $100, and there was a provision in their policy whereby it was impossible to pay a claim of over $100 until after the crop was harvested, he thought that in order to arrive at a proper conclusion as to the amount of damages he had suffered it would be advisable to wait until then and compare it with the crop of peas on the prison farm, which, in answer to their inquiry, he had told them was the nearest farm growing peas. Arbitrator Andrews, who was acting as spokesman, replied, saying, as he states it, "We agreed that was a reasonable way to do it." Plaintiff told them that if his yielded as much as the prison farm crop he would not ask any damages, and Andrews replied he thought "that a reasonable way to look at it." After interviewing plaintiff the arbitrators left with Milbourn and Garber. Plaintiff testified he understood from what took place that a decision would not be made until after his crop had been harvested; no question was raised at that time as to there having been a hailstorm upon the crop and it was so assumed in their conversation, the main thing under discussion being the question of damages; he had no knowledge of the talk in Peckham's store; his statements were not disputed; he was not asked to produce any witnesses; and did not know they were then going to decide the matter. Arbitrator Hending testified that he got Milbourn's sentiments at Parma before he came to the farm and before they ever talked with plaintiff. After leaving plaintiff's farm the president, secretary, and three arbitrators of the company went to the prison farm and examined the pea crop there, which was then being harvested, and

returned to Parma where the arbitrators went into a restaurant and signed an award which, omitting formal recitals, states that:

"After viewing and hearing the evidence as per section 11, we have therefore determined said loss to be no loss. June 22, 1923."

Just when notice of that award was given plaintiff is not disclosed.

Plaintiff thereafter filed a bill in the circuit court of Jackson county, in chancery, setting up the facts in regard to the matter from his standpoint, asking that the so-called award in regard to his claim be declared a fraud upon his rights and therefore null and void; that, the court having acquired jurisdiction over the subject-matter of the suit by reason of that charge, it determine and decree the amount of loss sustained by him under the terms of his policy of insurance caused by hail as set forth, concluding with a prayer for general relief. Defendant duly answered in denial, and the case was heard on pleadings and proofs taken in open court, resulting in a decree finding the material allegations in plaintiff's bill of complaint were true, that the award of the arbitrators purporting to have been made on June 22, 1923, determining "said loss to be no loss" was a fraud upon the rights of plaintiff, and set the same aside, finding as to damages:

"That the said plaintiff did sustain loss by hail to his crop of peas on, to wit, the 7th day of June, 1923, in the sum of $2,504; that such hazard of damage by hail was insured in the defendant insurance company upon its policy, number 27,865, and that the defendant became liable to the plaintiff for the payment of such damage."

A decretal judgment for that amount with interest was rendered, from which defendant duly appealed.

The major questions raised, discussed, and decided at the hearing and argued here are in substance that

the court erred in setting aside the award of the arbitrators, in holding that recovery was not limited by the terms of the policy to such an amount as it could raise by a 3 per cent. assessment on its garden truck policies, in admitting certain testimony as to damages, and in fixing the same at the amount decreed.

Defendant's agent, Peckham, who sold the insurance, testified the application therefor was all in his handwriting except the signature. By its terms plaintiff made application for:

"Membership and indemnity against damage or loss to growing grain, fruit, and other farm products as specified below   *   *   *   (specification being) $4,000 on 100 acres garden truck; section 12; township, Parma; county, Jackson, Mich."

Peckham testified that on those applications he collected the fees and sent them to the company less his commission, and the policies went direct to the applicant. The policy, as signed by defendant's secretary, is a brief instrument. After introductory statements of name, address, date, etc., with recital that plaintiff has become a member of defendant according to its charter and by-laws, it is, in material parts, as follows:

"And has insured in said company, against loss or damage to growing grain, fruit, and other farm products by hail, to the amount of $4,000, from noon of the fifth day of June, 1923, on the following described premises:

(Insurance does not apply to fruit and garden truck unless specifically mentioned and taken.)   $4,000 on 100 acres of garden tr'k.   Sec. 12 Parma Twp. Jackson county, Mich.

"And the said company does hereby promise and agree to make good unto the said insured or the legal representatives, all such loss or damage, not exceeding the amount insured, as shall happen by hail to the property above named   *   *   *   the said loss or damage to be estimated according to the actual cash value at the time the same is adjusted; to be paid

within sixty days after due notice and proofs of the same, made by the insured, as hereinafter provided, are received at the office of this company.

"The company expressly reserves the right to cancel this policy at any time upon good and sufficient reason.

"R. A. GARBER,
"Secretary."

The record indicates that its 16 articles of association and 14 by-laws accompanied and were made a part of said policy, which is marked in the record as exhibit A. The articles of association are of the customary form for organization adopted by corporations of this nature, providing for officers, their duties, meetings, records, etc. As pertinent here, they are as follows:

"ARTICLE 7. * * * There shall be elected six policyholders to act as arbitrators on the losses in dispute sustained by the members of the company and whose duties shall be provided for in the by-laws. * * *

"ARTICLE 12. When the amount of losses and expenses have been determined by the board of directors, if deemed necessary, the secretary shall on or before the first day of November of each year, upon order of the board of directors, make an assessment roll to cover the liabilities of the company together with an amount not to exceed one dollar each one thousand dollars insured, in excess of all liabilities of the company, to date of assessment as a reserve fund, which reserve fund shall not exceed $50,000 (fifty thousand dollars), which assessment is due and payable to the secretary or his receivers by postoffice money order, express money order, registered mail or draft during the month of November. * * *

"ARTICLE 13. The written application for insurance shall be a part of the policy and a copy of the charter and by-laws of said company shall be printed on the policy. * * *

"ARTICLE 16. The risks of this company shall be of three classes.

"Class No. 1 shall cover general farm crops, other than fruit and garden truck.

"Class No. 2 shall cover fruit only.

"Class No. 3 shall cover garden truck only.

"Each class shall be assessed for the losses occurring within its respective class only.

"The expenses of the company shall be spread *pro rata* on the aggregate amount of insurance carried by the company.

"This company does not insure and in case of loss will not be liable for more than forty dollars per acre on loss or damage occurring in class No. 1, or one hundred dollars per acre on loss or damage occurring in classes No. 2 or 3."

Defendant's by-laws provide in part as follows:

"SECTION 1. This company insures its members, their heirs or assigns, against loss or damage by hail to their growing crops as follows: On all farm crops except fruit and garden truck not to exceed $40 per acre and on fruit or garden truck not to exceed $100 per acre. The damage shall be determined by the general wholesale price in the vicinity of the crop damaged. * * *

"The secretary shall instruct an adjuster to appear at the scene of loss and adjust the same which shall be paid within sixty days from the date of adjustment.

"A loss exceeding $100 shall not be adjusted before the maturity of the crop. * * *

"SEC. 8. Assessment shall not exceed three per cent. in any one year. If the losses exceed the assessment of three per cent., losses shall be paid *pro rata* and such payment shall be received and accepted by the insured in full satisfaction of all claims against this company.

"SEC. 9. When there is partial loss or destruction of any property insured * * * the assured shall immediately proceed to care for the remaining portion to the best of his ability or as he and the association's representative shall agree. * * * In case of crops being damaged by hail, the crop shall be harvested, a true account of the amount of grain, hay, seed or other products grown upon the land insured in this association shall be kept and delivered to the association.

"SEC. 10. * * * It is further understood and agreed that the association shall not be liable under

hail insurance policies for any loss or damage from windstorms, tornadoes, cyclones or rain, or from any loss or damage except that occasioned by hail.

"SEC. 11. In case the loser of property insured is dissatisfied with the adjustment offered by the adjuster of this company as to the amount in whole or in part, the loser shall within five days of such adjustment notify the secretary of the company in writing of such dissatisfaction, when such matter in dispute shall be left to the arbitration board. The secretary shall within 10 days after the receipt of such notice of dissatisfaction select 2 or 3 arbitrators who shall constitute the board of arbitration to pass upon the matter in dispute, and shall within said 10 days notify the arbitrators and loser of the time of hearing, which shall be at the place of loss.

"At such hearing the board of arbitration shall view the loss, and each party may submit other evidence as either may desire. After taking in all the evidence said board of arbitration shall render their award. And the decision of such award shall be final and binding on both parties and no suit at law or equity shall be commenced and maintained to retry or rehear such matter in dispute. If the loser does not demand such arbitration within five days, the amount fixed by the adjuster shall be binding on the loser, and the company. * * *

"SEC. 12. Policies will not be issued on farm crops for less than $5 per acre, nor less than $80 per acre on fruit, or less than $40 per acre on garden truck."

The decision of the trial court holding void the arbitrators' award that the loss was no loss is well sustained by abundant authority as applied to the facts in this case. The award was not only at least constructively fraudulent under the facts shown, but in violation of defendant's own by-laws. On June 22, 1923, 15 days after the hailstorm, when the arbitrators met at plaintiff's place, the crop was nearly ready for harvesting, which began three days later. Plaintiff testified that immediately after the storm he examined his crop, found the vines, leaves, and blossoms badly broken and cut off, the ground in places being covered

with blossoms. Hunn, who examined the field shortly after the storm, said:

"I found some vines cut off, leaves cut and many blossoms on the ground. In different places I noticed a great many blossoms on the ground, and stems and pieces of vines. * * * I noticed there were more vines cut in the center of the field and in the west field than I noticed in the center field and in the east field the first time I was there. There were places where they were cut badly. There was damage in all the three fields. I would say 30 or 40 per cent. of the crop was damaged. * * * I didn't notice so much twisted as cut off and beat down. * * * The whole blossom, some stems, some buds, small pods."

King, who visited the place the next morning, testified:

"In this pea field, I found the blossoms knocked off onto the ground; they lay there on the ground, and small pieces of vine knocked off by something. * * * I thought a third of the blossoms were knocked off on the ground there with the vines we picked up and looked at. * * * We found stems off, pieces of vines that were knocked off."

Charles Griswold, assistant superintendent of the Michigan prison cannery, testified he was at plaintiff's place with four prison inmates at the time this hailstorm came, preparing to shell plaintiff's peas when ready to be harvested, that—

"The wind blew and it hailed, and the boys went out and picked them up by the handsful in front of the barn. * * * Shortly after the storm subsided the five of us went down into the fields and the peas. We all picked up blossoms laying on the ground cut off by the hail. * * * It was an awful storm, the ground was covered with hail as near as I can tell it, all the fields. * * * There were pods cut off, small pods. There were numerous pods laying on the ground."

George Bretherton, superintendent of the Michigan

State Prison's farm, testified he had seen this pea crop numerous times while it was growing, as the peas were being raised for the prison cannery under his supervision, and said:

"I never saw a better piece of peas in my life than what there was on the Campbell farm that year. They were ahead of our peas. His fields are level, level fields each right side by side, when in full bloom are a beautiful sight. I saw these peas when they were in full bloom, but before this hailstorm. Saw them all summer long. I did not go to those fields to see if there was any damage to them. * * * I would say when it was in blossom it had every prospect of a bumper crop, and when it got time to harvest that crop, why the peas weren't there to harvest."

Defendant's by-laws provided that when its arbitrators are summoned to determine a loss the arbitration "shall be at the place of loss." Only one arbitrator went directly there. The other two met the president and secretary of defendant at Parma, three miles from the place of loss, and went with them to the store of defendant's agent, where they discussed the subject and decided amongst themselves there was no loss. After so concluding they went to the appointed place where they met plaintiff and the other arbitrator. They did nothing there but look at the fields, talk with plaintiff and among themselves. It is undisputed that when plaintiff suggested that, under their by-laws, the matter should not be decided until the crop was harvested, they agreed that was the sensible thing to do. After asking him the nearest location where peas were raised they left, with every indication that they expected to examine the prison farm, as they did, and withhold their award until maturity and harvest of the crop, which was close at hand. When they visited the pea fields on the prison farm, they found the crop was being harvested. After seeing the prison crop they returned to Parma and made their award that

said loss was no loss. Their haste to do so under those circumstances, if actuated by a desire to render a fair award, is as inscrutable as the ways of Providence. Deprecating any intention to impeach the honesty of the arbitrators, the trial court truthfully said of this, in part:

"Their own rules require them to await the harvest if the damage is $100 or more. They assumed there was no damage at all. * * * If there was no damage, the harvest would have demonstrated it; and in refusing or neglecting to wait, under the circumstances, they not only made a mistake, but their action borders on the arbitrary. * * * That ought to be of some force, in view of the fact that in this case there was no award at all, while the proofs satisfy me there was great damage."

Beyond that, the arbitrators in fact held no legal arbitration, but apparently construed and applied the provisions of their by-laws for arbitration along lines applicable to and practice permissible only in appraisals.

In *Noble* v. *Grandin,* 125 Mich. 383, involving the sale of a tract of timber upon which $25,000 was paid on the purchase price, it was agreed the full price should be determined by the amount of merchantable pine timber standing on the land, to be estimated by three chosen appraisers. In discussing that provision the court said:

"This, most certainly, is not a submission to arbitration. The theory of an arbitration is that it is a substitute for a proceeding in court. * * * There is a broad distinction between a submission to arbitration and the reference of a collateral or incidental matter of appraisement, measurement, or calculation."

In 5 Joyce on Insurance (2d Ed.), p. 5406, § 3231, it is said:

"Again a distinction is made between a reference to arbitration which involves the entire controversy and

the question of liability, and an agreement for an appraisal where the liability is conceded and which is for the purpose of merely determining the loss, or of appraising it, or the salvage, or where it is a mere case of valuation, in which cases the strict rules governing arbitration and awards are not applicable;" citing numerous authorities, including *James* v. *Schroeder*, 61 Mich. 28.

An appraisement is made as auxiliary or incident to a contract. Unless otherwise provided, appraisers can act on their own knowledge and investigation, are not required to have hearings or take evidence or even receive the statements of the parties. As long as they act honestly and in good faith they have a wide discretion as to their methods of procedure and sources of information. *Sebree* v. *Chicago Board of Education*, 254 Ill. 438 (98 N. E. 931). Defendant's articles of association and by-laws make no mention of appraisers or provision for them as such, but provide specifically for *arbitrators* and arbitration, repeated some 12 or 13 times, with requirements and restrictions on the procedure of the arbitrators when holding an arbitration, which were not observed in the instant case. In *Hewitt* v. *Village of Reed City*, 124 Mich. 6 (50 L. R. A. 128, 83 Am. St. Rep. 309), this court said, speaking through Chief Justice MONTGOMERY:

"The rule is very strict in excluding any communication to an arbitrator, made *ex parte* after the case is submitted; and when such communication, which may affect the result, is made, it is not usual to enter into an inquiry as to whether the arbitrator was in fact influenced by it or not;" citing supporting authorities.

It is further contended for defendant that comparison of plaintiff's crop with the west prison farm crop, some nine or ten miles away, for the purpose of determining plaintiff's loss, was incompetent. No peas were raised nearer. Both crops were of the

same kind of peas, raised for canning purposes. Plaintiff contracted to raise his crop for and sell it to the prison cannery. The fields he planted were level, clay soil as good as any in that section, in clover when he turned the sod over the previous fall in preparation for planting. He prepared the ground and planted the peas under direction of the superintendent of the prison farms, who testified that the west prison farm crop of 94 acres was their best and all conditions as to it compared well with the Campbell crop, except no hailstorm had struck the prison farm; that he would not say any of the soil of their west prison farm was better than Campbell's; he had the best farm and best soil; some of the pea fields on their north farm compared well with his and some were not quite as good; the peas on the two farms were planted under like conditions; the ground on both was plowed the previous fall under his directions, thoroughly harrowed in the spring and sown with the same kind of canning peas; rain conditions were similar at the two places and the crops did not suffer for moisture. The average yield of the fields on the west prison farm was 1,534 pounds per acre, while the peas on the Campbell farm averaged 907 pounds to the acre. The peas would develop for canning in about 60 days after seeding, and in about 12 days from the time they blossomed they were ready for harvesting and shelling, which was done before the peas became too hard for canning. It was shown those green canning peas had to be in the cans in from four to eight hours after being cut. The contract price from the viner which shelled them was four cents per pound. This testimony was not too remote for the court to take into consideration. From it, in connection with other evidence bearing on plaintiff's loss, there was a fair basis for determining the loss found by the court, and we find no occasion to disturb such finding.

It is further contended by defendant that in any aspect of the case the damages decreed are excessive because plaintiff's recovery is limited by section 8 of defendant's by-laws to his *pro rata* share of a 3 per cent. assessment on "garden truck" policyholders, or third class, as specified in article 16 of its charter, upon which liability is limited to a maximum of $100 per acre. This is repeated in section 1 of its by-laws, with a minimum of $40 per acre specified in section 12 of its by-laws. The total amount of insurance in the three classes is not shown, but defendant's secretary testified it had 15,000 members in all three classes. The total amount of insurance it carried in the third class was but $61,900, on which the 3 per cent. assessment would raise a total of $1,857. The losses in that class for 1923, aside from plaintiff's, were $1,498, which defendant had paid in good faith, leaving only $359 which could be raised from the maximum assessment. From this it is insisted that under any circumstances plaintiff would only be entitled to recover that amount.

For plaintiff it is contended, and the trial court held, that section 8 of the by-laws providing for a 3 per cent. assessment limited in each case to its particular class is not authorized by the statute under which defendant was organized or its articles of association.

Defendant was organized under Act No. 16, Pub. Acts 1911 (2 Comp. Laws 1915, § 9743 *et seq.*). Section 3 provides that a company organized under that law shall not be permitted to do business—

"Until *bona fide* agreements have been entered into for insurance with at least one hundred individuals, covering property to be insured to the amount of not less than one hundred thousand dollars." * * *

Section 5 of the act authorizes the articles of association to—

"Prescribe the liabilities of the members to be assessed towards defraying the losses and expenses of the company and the mode and manner of collecting such assessments."

Section 10 provides that the company—

"Shall have the right to provide in its articles of incorporation for the collection annually of an assessment of not exceeding one dollar per thousand on the amount insured for the purpose of accumulating a surplus, in addition to such assessments as are necessary for the payment of current losses and expenses until such time as the accumulated surplus of the company shall equal fifty thousand dollars."

Apparently under the authority of section 10, article 12 of the charter provides for such a course to be pursued after losses and expenses have been determined by the board of directors "if deemed necessary," from which, if any inference is to be drawn, the article contemplates that it may not in some years be necessary to make any assessments either because it had a sufficient surplus or had sustained no losses during the year. We find nothing in either the statute or articles of association authorizing section 8 of the by-laws to be adopted as a limitation of the company's general liability. By-laws are only binding on members when made within the scope of the authority given the company by the statute under which it is organized and its authorized articles of association. 32 C. J. p. 1022.

The statute clearly contemplates an insurance company having the standing and financial strength of 100 members insuring property aggregating at least $100,000 as a basis on which it may do business. Under defendant's theory of class assessment the individual's policy is not backed by such strength, but in legal effect it is divided in financial responsibility into three insurance companies operating under one organized management, plaintiff being beneficially in-

sured in only one of them, which does not have the statutory requirements as to amount of insurance.

It is evident in the instant case that when harvest time approached plaintiff, either through suggestion of the agent or on his own initiative, was minded to insure his promising crop of peas from the hazard of hail to the amount of $4,000. His peas were a farm crop in large fields covering over half of his farm. Field peas are a common farm crop. His $4,000 insurance could have been taken as the maximum of a "general farm" or the minimum of a "garden truck" crop. The fact they were to be harvested green, simply shortened endurance of the risk. To what extent the difference between "general farm" and "garden truck" insurance was then explained to or understood by him is not shown. The agent filled out his application. Up to that time, he was not a member of or insured with defendant. The policy with its articles of association and by-laws attached was not received by him until after the storm which injured his peas. In the brief policy itself, as signed by defendant's secretary, it was printed in plain, good-sized type with leaded lines that the company "does hereby promise and agree to make good unto the said insured or the legal representatives, all such loss or damage not exceeding the amount insured, as shall happen by hail." It is not shown that defendant's agent when obtaining the insurance advised plaintiff of the limitations in section 8 of its by-laws, and it can fairly be assumed, as his testimony indicates, plaintiff's understanding of the transaction was that he had insured his crop to the extent of $4,000, and defendant in fact wrote him $4,000 of insurance, which authorized it to collect assessments on $2,143 of insurance it never could pay, under the theory here urged in its defense.

It was shown that defendant had a surplus for the year 1923 of $13,000. Just what that surplus was

accumulated for, if not to meet obligations for losses suffered under its policies is left to conjecture.    No assessment "if deemed necessary" would be made until the following November.    Suggestively, plaintiff's policy provides that any loss suffered under it "should be paid within 60 days after due notice and proofs of the same, made by the insured."

We find no occasion in fact or law to disturb the decree.    It will stand affirmed, with costs to plaintiff.

SHARPE, C. J., and BIRD, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.