**CHICAGO TITLE & TRUST CO., as Trustee under Trust No. 49944, Plaintiff-Appellant,**

v.

**UNITED STATES FIDELITY & GUARANTY CO., Defendant-Appellee.**

No. 73–1941.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1974.

Decided Feb. 19, 1975.

Marvin Glassman, Chicago, Ill., for plaintiff-appellant.

Paul J. Wisner, Chicago, Ill., for defendant-appellee.

Before MARIS * and HASTINGS, Senior Circuit Judges, and TONE, Circuit Judge.

TONE, Circuit Judge.

The issue in this diversity case is whether the insured may recover under an Illinois fire insurance contract for the loss of a building that had little or no economic value at the time of the loss. To decide this issue we must return to the area of the law visited last year in Garcy v. Home Ins. Co., 496 F.2d 479 (7th Cir. 1974). The plaintiff insured appeals from an order entering summary judgment for the defendant insurer on the issue of damages and dismissing the remainder of the case as moot.

The building in question, 1312–1316 West 79th Street, Chicago, Illinois, was a three-story masonry structure containing two store premises and four apartments and built about 55 years ago. In 1966 the building was conveyed into a land trust, of which plaintiff is trustee.

In 1970 an action to foreclose the mortgage on the building was commenced in the state court, as was an action by the city alleging numerous building code violations and seeking, *inter alia,* demolition of the building. In the city's suit, the court appointed a receiver on an emergency basis to restore heating but, in January 1971, ordered him to vacate the entire premises and not to make any heating repairs. Later the same month the court discharged the receiver. In the foreclosure action, the mortgagee acquired the beneficial interest in the land trust in 1971. Later that year it sold that beneficial interest for $7,000 to one Alex Salb, who took the interest in the name of a nominee to avoid personal liability.

Defendant issued its fire insurance policy on the building in the amount of $50,000 for the term August 24, 1971 to August 24, 1972 under the Illinois Property Insurance Placement Facility, commonly known as the Illinois FAIR Plan.[1]

---

* Senior United States Circuit Judge Albert B. Maris of the United States Court of Appeals for the Third Circuit is sitting by designation.

1. The National Insurance Development Program, of which the FAIR Plan is a part, is a quasi-governmental insurance program, created by statute (12 U.S.C.A. § 1749bbb; Ill.Rev. Stat., Ch. 73, § 1065.69 et seq. (1971)) to provide insurance at a reasonable cost for high risk urban properties unable to qualify for or obtain insurance through normal private channels. As the program was developed in Illinois, the FAIR Plan Association

The policy, originally issued in the names of the mortgagee and the receiver, was assigned to the plaintiff trustee and the assignment consented to by defendant on November 11, 1971.

On February 6, 1972 the building suffered the first of two fires. Defendant paid $18,556 for this loss to plaintiff trustee, who turned it over to Alex Salb. The insurance company adjuster's report on this claim shows that this figure was based on an itemization of damage and an "actual cash value" for the building prior to the fire of $60,435 (total replacement cost of $119,436.40 less 45 percent depreciation and uninsurables). Salb did not spend any part of the insurance proceeds on the building.

On February 29, 1972, at a hearing in the city's action in the state court, a city building inspector testified that he had inspected the building the previous day and it was "vacant and open." The court ordered a "D and H [dangerous and hazardous] inspection" and continued the hearing to March 14, 1972. At the continued hearing on that date the inspector testified that the building was still open, vacant, severely damaged, and in a dangerous and hazardous condition. The court ordered Salb's attorney to board and secure the building.

That very day,[2] however, Salb, instead of boarding and securing the building or spending any of the insurance proceeds he had received to rehabilitate it, assigned his beneficial interest in the land trust to Oddie Banks, who late in March married and became Oddie Banks Wright. She testified in a deposition that the agreed price was $4,400, but that she paid only $400 down and was to pay the balance at the rate of $100 per month beginning 60 days from the date of purchase. All she ever paid, however, was the original $400. No purchase contract has been produced by her.

Oddie Banks Wright's application to FAIR for an assignment of the policy was not submitted until several weeks after she had purchased the beneficial interest and was never acted upon. Defendant, however, makes no point of this and acknowledges that the policy continued in force after she acquired the beneficial interest.

On April 12, 1972, the state court again ordered that the building be boarded and secured immediately.[3] Yet Oddie Banks Wright's husband, Oscar Wright, testified by deposition that he had caused certain repairs to be made to the building during the one and one-half month period between the date of his wife's purchase of the building and May 1. Although he testified that over $7,000 was spent, no invoice or other corroborating evidence was produced.

On May 1, 1972, eighty-five days after the first fire, the building suffered a second fire. Plaintiff filed this action on Oddie Banks Wright's behalf to recover $43,795 for the loss resulting from that fire.

After discovery, plaintiff filed a motion in limine asking the court to exclude evidence of the amount paid by Oddie Banks Wright for her interest or of the

issues policies in its own name or has private insurance companies underwrite the policies. Any person having an "insurable interest" in a qualifying property can apply if unable otherwise to obtain insurance, and upon completion of an inspection and approval of the premises, the application is referred to a designated participating insurance company.

2. The assignment was dated March 14, 1972, but was not accepted by the trustee until April 7, 1972, which accounts for the District Court's statement that Oddie Banks' purchase occurred on April 7. See Chicago Title & Trust Co. v. United States Fidelity & Guaranty Co., 376 F.Supp. 767, 769 (N.D.Ill.1973).

3. On September 6, 1972 the state court ordered the building demolished.

We note that the Wrights made no effort to halt the demolition of the building, even though Oddie Banks Wright remained the beneficiary of the land trust notwithstanding her failure to make any of the $100 monthly payments allegedly contemplated by the purchase agreement. In fact, it appears from the deposition of Oscar Wright that even though he was technically managing the building for his wife, he did not know when the building was demolished, or by whom, or under what circumstances, knowing only that it was "down Christmas."

market value of the building on the ground that "actual cash value," as defined in a fire insurance policy, means reproduction cost, less depreciation. Plaintiff also moved to strike from defendant's answer the defenses based on the vacancy[4] and increase-of-hazard clauses of the policy.[5] Judge Will denied both motions by a memorandum opinion and order dated June 7, 1973, Chicago Title & Trust Co. v. United States Fidelity & Guaranty Co., 376 F.Supp. 767 (N.D.Ill.1973), in which he held that plaintiff had no insurable interest, and was therefore not entitled to any damages at all, because the building was "economically useless at the time of the fire." The motion to strike defenses was denied on the ground that whether they were meritorious depended upon disputed issues of fact.

After additional motions and cross-motions, the details of which are not significant for present purposes, Judge Will entered summary judgment in favor of defendant on the issue of damages and dismissed the remainder of the case as moot, pursuant to a brief memorandum of opinion, which is unpublished.

We agree with the District Court that it would be "grossly inequitable" for plaintiff's beneficiary to recover in excess of $43,000 in insurance proceeds on the facts of this case, and that the law cannot permit such a result. We reach that conclusion, however, by a somewhat different route from that followed by the District Court.

### The Authorities

The fire insurance policy in issue insures against loss "to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss," with certain other limitations not here material.

The decision that appears to establish the definition in Illinois law of "actual cash value" is Smith v. Allemannia Fire Ins. Co., 219 Ill.App. 506 (3d Dist. 1920), which held that the phrase means reproduction cost, less depreciation for age, and not market value. Although the Illinois Supreme Court has never been squarely presented with the issue decided in that case,[6] Smith has been followed as the law of Illinois by this court. Esquire Restaurant, Inc. v. Commonwealth Ins. Co. of New York, 393 F.2d 111 (7th Cir. 1968); Wisconsin Screw Co. v. Fireman's Fund Ins. Co., 297 F.2d 697 (7th

---

**4.** Defendant alleged that "the building was abandoned and unoccupied for a period in excess of sixty days, in violation of the provisions of the said policy of insurance, rendering the said policy void." The depositions contain references to a tenant who supposedly occupied one of the shops and "was supposed to pay but . . . never paid rent." Apparently neither the Wrights nor the public adjuster whose reports they rely on ever saw this person. Nor, apparently, was he observed by the city building inspector, who reported the building vacant.

**5.** Defendant alleged that plaintiff, through deficient management, permitted the building to fall into a state of disrepair and uninhabitability, such that the various building codes of the City of Chicago were violated, constituting an increase of hazard which served to suspend the policy. Defendant contends that failure of plaintiff to satisfy these conditions of the policy completely exonerates the Company from any liability arising from losses occurring during the vacancy or increased hazard.

**6.** The issue in First National Bank of Highland Park v. Boston Ins. Co., 17 Ill.2d 147, 160 N.E.2d 802 (1959), cited by plaintiff here, was whether the insured's interest was limited to the balance due it as vendor under a partly executed contract to sell the property, when the purchaser had the option of returning the land to the vendor in the event of fire. In holding that the insurer could not avail itself of the terms of the land contract, the court stated as follows: "It is true that as between the vendor and the vendees in this case the value of the vendor's interest under the contract at the time of the fire was $16,000. The insurers, however, made no attempt to show that the contract price of $19,000 represented the actual value of the insured building. Indeed, they conceded that its value exceeded the aggregate amount of the policies, $46,750." The court stated its holding as being "that the contract price did not conclusively determine the value of the vendor's interest for the purpose of determining the amount due upon the insurance policies." (17 Ill.2d at 151, 160 N.E.2d at 804–805.)

Cir. 1962); Knuppel v. American Ins. Co., 269 F.2d 163 (7th Cir. 1959).

The *Smith* rule was designed to prevent inequities that may result when there is a disparity between the market value of the real property destroyed and the value of that property to the insured, who in fairness should be put in substantially the same position he was in before the fire. 6 Cooley, Briefs on the Law of Insurance 5089–5090 (2d ed. 1927). Because doctrinaire application of the reproduction-cost rule would sometimes result in windfalls to insureds, the courts of some states have adopted a "broad-evidence rule," under which the trier of fact is entitled to consider, in arriving at "actual cash value," all evidence relevant to the value of the property at the time of the loss, including both market value and reproduction value. McAnarney v. Newark Fire Ins. Co., 247 N.Y. 176, 159 N.E. 902 (1928); Messing v. Reliance Ins. Co., 77 N.J.Super. 531, 187 A.2d 49 (1962); National-Ben Franklin Fire Ins. Co. v. Short, 207 Okl. 673, 252 P.2d 495 (1953). The Illinois courts have not yet seen fit to adopt a broad-evidence rule.

Illinois law has not, however, been insensitive to the potential for inequity in the *Smith* rule. In Lieberman v. Hartford Ins. Co., 6 Ill.App.3d 948, 287 N.E.2d 38 (1st Dist. 1972), the court held that when the owner of a building had entered into a contract for its demolition, and the demolition was in its early stages, he had no "insurable interest" because the building had no economic value. Shortly before the Illinois Appellate Court decided *Lieberman,* Judge Marovitz held, in Aetna State Bank v. Maryland Casualty Co., 345 F.Supp. 903 (N.D. Ill.1972), that because a building in the process of demolition had no value, the

insured had suffered no compensable loss when that building was damaged by fire. The District Court in the case at bar relied upon the *Lieberman* and *Aetna State Bank* cases in holding that because the insured building was economically useless at the time it was destroyed by the second fire, the owner had no insurable interest.

Garcy Corp. v. Home Ins. Co., *supra,* 496 F.2d 479, involved one of the several buildings that were the subject of the *Aetna State Bank* case, in which the bank had sued as the mortgagee of the property. In *Garcy* the action was brought by the mortgagor. The defendants did not plead collateral estoppel in view, *inter alia,* of lack of privity. Judge Marovitz had decided *Aetna* on the basis of a stipulation which recited that all five buildings were in the process of demolition. In fact, the building involved in *Garcy* was not. At the time of the fire, that building was in use as a warehouse. The plaintiff had hoped to sell it before the wrecking crews reached it and could have halted demolition although, had it done so, it might have been liable for damages on the demolition contract. The building had not been stripped of salvagable material or prepared for demolition. On the basis of these facts, the court distinguished *Aetna* and *Lieberman,* viewing them and other cases as turning on the finality of the commitment to demolish or abandon use of the building. The court also discussed Judge Will's opinion in the case at bar, describing it as holding "that the definition of actual cash value as reproduction cost minus depreciation 'is limited in application to those buildings which are being economically utilized at the time of their damage and destruction,'"[7] and did not disapprove

---

7. The court in *Garcy* assumed, of course, in its discussion of the opinion of the District Court in the case at bar, that there was no genuine issue as to whether the building had any economic value.

It should be observed also that in one minor respect the statement in *Garcy* of the facts in the case at bar is inaccurate: the order not to repair the heating system had been issued by the state court rather than the city and had been withdrawn at the time of

the fire. That order, it should be added, had been issued over one year before Oddie Banks acquired her interest rather than, as stated in the original opinion of the District Court in the case at bar, one day before. The District Court's later opinion, which is unpublished, corrects the latter error. It is also to be noted, however, that there was outstanding at the time of the second fire a later state court order to board up the premises.

that principle but distinguished the case before it as one in which the building did have economic utility. (496 F.2d at 482.)

■ It appears from the *Lieberman* case that the *Smith* rule is limited by the policy of the law that requires an insurable interest as a condition to recovery on a contract of insurance. If, at the time of the fire, the building no longer has any economic value, there can be no insurable interest and therefore no recovery of damages.

### The Summary Judgment

■ While, based on the present record, we share the District Court's skepticism concerning the contention that plaintiff made repairs totaling several thousand dollars, which may have infused some economic value into the building, there is sworn testimony, albeit entirely undocumented, that this occurred,[8] and we do not think it can be said as a matter of law that this testimony was so inherently unbelievable that no genuine issue of fact existed. The same can be said of the claimed obligation to pay, in addition to the $400, a balance of $4,000 at the rate of $100 per month. We are, therefore, unable to affirm a summary judgment for defendant that rests on the premise that there is no genuine issue concerning plaintiff's expenditures and financial commitments.

### The Extent of Plaintiff's Insurable Interest

■ Our inability to accept the summary judgment that no damages whatsoever are recoverable does not automatically impel us to the other extreme urged by plaintiff, *viz.*, a judgment in its favor, for the benefit of Oddie Banks Wright, in the amount of $43,795 for the destruction by fire of a building that, to mention only the highlights, (a) had been purchased two years before the fire for $7,000; (b) had been the subject of a demolition suit for 21 months and was at the time of the fire subject to state court orders in that suit to board up and secure; (c) had already suffered, less than three months earlier, a fire for which the then owner had collected $18,556 on the same policy; (d) had been the subject, between the two fires, of city inspection reports to the state court declaring it to be open, vacant, seriously damaged, and hazardous; and (e) for which the present owner had paid $400 and claimed to have agreed to pay, over a period of time, an additional $4,000, no part of which was ever paid.[9] That an

---

8. In a sworn statement made one month prior to the filing of the complaint in this action, Mrs. Wright stated that she never went back to the building to look at it after she bought it, which raises doubt as to the extent, if not the existence, of any personal knowledge that would permit her to give evidence as to the repairs. (See Federal Rules of Evidence, Rule 602, Pub.Law 93–595, 93rd Cong., 2d Sess.) She testified, however, "We had a new roof put on, and the plastering and dry walls," which she said was done by one J. Simons or J. Simon, whose name she could not spell. Her husband testified on deposition that, after his wife acquired the building, "we did roof work. We were starting the electrical work, and started some plumbing work," and that the amount "spent on those repairs" was "somewheres around seven or $7,500." No documentation of any kind was ever produced to support the testimony concerning repairs. It will be recalled that on April 12, 1972, at the mid-point of the period during which the repairs were supposedly going on, the state court ordered the building boarded and secured.

9. Concerning the nature of the financial arrangement between Oddie Banks Wright and Alex Salb, we note from the depositions and sworn statements that Salb's lawyer, Mort Rubenstein, continued, at the request of Salb, to represent the interests of the property owners in Circuit Court even after the assignment; that Oddie Banks Wright contacted Salb immediately upon learning of the May 1st fire, whereupon he arranged for the same public adjuster who had handled the appraisal after the first fire to perform the same task again; that the Wrights apparently were not notified of the impending demolition of the building, since Salb and Rubenstein were presumably handling the case; and that Salb neither attempted to collect the monthly payments allegedly due nor took any action to foreclose the mortgage he allegedly held for the balance of $4,000. On remand the District Court will no doubt explore the genuineness of the original obligation to pay the $4,000 balance.

Illinois court would not allow itself to be the instrumentality for the perpetration of such a gross inequity is apparent from the *Lieberman* case, in which the court invoked the requirement of insurable interest to prevent injustice.

In *Lieberman* "[t]he destruction of the building was not 'economically disadvantageous' to plaintiff; he would have gained no advantage by the continued existence of the structure and suffered no loss by its destruction." (6 Ill.App.3d at 950, 287 N.E.2d at 40.) The insurable interest requirement, therefore, precluded recovery of any damages. In the case at bar we must predict what an Illinois court would do when the insured building, instead of having no economic value whatsoever, has a value that is nominal or grossly disproportionate to reproduction cost, less depreciation. The law review article cited and relied upon in *Lieberman* offers some guidance by demonstrating that in some situations courts have applied the requirement of insurable interest, not to bar recovery completely, but to limit the amount of damages to correspond to the insured's limited interest. B. Harnett and J. Thornton, Insurable Interest in Property: A Socio-Economic Reevaluation of a Legal Concept, 48 Col.L.Rev. 1162, 1175–1178 (1948). That article is also instructive in its statement of the policies underlying the requirement of insurable interest as " . . . the policy against wagering, the policy against rewarding and thereby tempting the destruction of property, and the policy of confining insurance contracts to indemnity." *Id.* at 1165. These policies would be offended by a contract requiring the insurer to pay the amount of reproduction cost, less depreciation, in the event of loss when there is a gross disparity between that amount and the value of the building measured on any rational basis, such as market value, economic utility, or utility for a special purpose of the owner. Such a contract would be predominantly a gam-

bling contract, would reward and thereby tempt the destruction of property, and would not be confined to indemnity. The insured in such a case who has recently purchased the building and spent money to repair it, presumably giving it some economic value, does, however, suffer some economic disadvantage from its destruction. He therefore has an insurable interest to the extent of his investment in the building, and should be entitled to recover to that extent, unless of course the building is irrevocably committed to demolition or is abandoned subsequent to the making of the expenditures.

Plaintiff points out that the co-insurance clause of the policy operates to reduce the recovery for a loss in proportion to the amount by which coverage is less than a given percentage, here 80 per cent, of the "actual cash value" of the property; and that, if "actual cash value" means replacement cost, less depreciation, for premium purposes and something less for loss purposes, an owner who applies for fire insurance on a building that has little or no economic value is faced with a dilemma under the rule we apply. If he takes out insurance in an amount equal to the required percentage of value, defined as replacement cost, less depreciation, he must pay a premium which is high in relation to the amount he can recover in the event of loss; yet if he takes out insurance in a lower amount, he must suffer the co-insurance penalty against any recovery in the event of loss.[10] In *Lieberman* the court did not consider this problem, yet there the insured had paid a premium for what turned out to be no insurance at all. Development of the law often causes some temporary dislocations calling for adjustments in business practices. Applying the doctrine of insurable interest to limit recovery to the amount of economic loss in cases such as the one at bar may mean that, at least until appropriate changes are made in insurance

**10.** In the case at bar, Oddie Banks Wright never had to make that choice, since the claim asserted on her behalf by the plaintiff trustee is on a policy purchased by one of her predecessors in interest.

**248**

practices, an owner of a building which has little or no economic value must pay a relatively high premium to be assured that if in fact he does suffer economic loss through damage to, or destruction of, the building, he will be able to recover the full amount of that loss. If a choice must be made between that result and allowing a recovery that bears no relationship to the insured's economic loss, *Lieberman* points to the choice that Illinois law would make.

If the evidence shows that the building was not irrevocably committed to demolition or abandoned, plaintiff will be entitled to recover on behalf of Oddie Banks Wright damages equal to the $400 she paid for the building, plus the amount of any genuine liability to the vendor arising out of the purchase contract and any amounts proven to have been expended for repair and rehabilitation, less, of course, the value of the land underlying the building. If the value of the land exceeds the sum of expenditures and liability on the contract, there will be no damages.

▮ Even though the amount that may be recoverable will presumably be less than the jurisdictional amount, diversity jurisdiction is not defeated in view of the possibility at the time the case was filed that a court would hold the *Smith* rule applicable. St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288–289, 58 S.Ct. 586, 82 L.Ed. 845 (1938).

Reversed and Remanded.