GENERAL CASUALTY COMPANY, Plaintiff-Appellant, v. TRACER INDUSTRIES, INC., Defendant-Appellee.

Fourth District    No. 4—96—0416

Argued November 7, 1996.—Opinion filed December 18, 1996.

COOK, J., dissenting.

Larry D. Kuster (argued), of Rammelkamp, Bradney, Dahman, Kuster, Keaton & Fritsche, of Jacksonville, and Robert W. Cockerham, of Brown & James, P.C., of St. Louis, Missouri, for appellant.

James L. Perbix (argued), of Perbix & Morgan, of Havana, for appellee.

JUSTICE GREEN delivered the opinion of the court:

Plaintiff General Casualty Company filed a petition against defendant Tracer Industries, Inc., to enforce an appraisal clause in a fire insurance policy issued to defendant. The policy provided for the parties to each appoint an appraiser, when necessary, to together appraise the loss suffered by an insured, and for the court to appoint an umpire if the appraisers could not agree. The petition alleged that an appraisal dispute arose here in regard to a fire resulting in total loss of a building in Havana. The court appointed Darrell Hilst umpire.

Hilst presented a report stating he was in agreement with the appraisal of James Johnston, appointed by defendant, which fixed the fire loss in the sum of $111,900, which was reduced by policy limits to $100,000. The sum of $33,527 had been paid, leaving $66,473 to be paid. Plaintiff filed a motion to set aside the determination resulting from the agreement of Hilst with Johnston's appraisal. The circuit court denied that motion. Judgment was entered against plaintiff for $66,473. By amendment that sum was later increased to $68,973.

Defendant appeals, maintaining the judgment was palpably erroneous because (1) Johnston's appraisal did not take into consideration the obsolescence of the insured building; (2) the award was so high that (a) it must have resulted from fraud, and (b) it was against public policy; and (3) a conflict of interest with Hilst rendered the judgment fraudulent. We affirm.

The evidence indicated that Robert Knake and William Knake, Jr., were the owners of the destroyed building. They were sons of William Knake, sole owner of the defendant corporation. The sons were named as additional insureds in the policy but, strangely, were never made parties to this suit. However, no issue has been raised in that regard.

■ The parties do not dispute that when a contract provides for a determination of amount by appraisers, substantial deference is given to that appraisal. *Bailey v. Timpone*, 75 Ill. 2d 539, 545, 389 N.E.2d 1193, 1196 (1979) (valuations under appraisal or arbitration would not be overturned "absent fraud or mistake"); *Board of Education v. Gorenstein*, 179 Ill. App. 3d 388, 394, 534 N.E.2d 579, 582-83 (1989) ("appraisers have wide discretion as to the methods and procedures they may follow in determining values"); *Sebree v. Board of Educa-*

*tion*, 254 Ill. 438, 446, 98 N.E. 931, 935 (1912) ("As long as appraisers act honestly and in good faith they have a wide discretion as to their methods of procedure and sources of information. Their conclusions, in the absence of fraud or mistake, will be binding upon the parties"); *cf. Hetherington v. Continental Insurance Co.*, 311 Ill. App. 577, 583, 37 N.E.2d 366, 368 (1941) (courts may set an award aside if it is clear that there has been "fraud, misconduct or palpable or gross error or mistake").

The *Bailey* court stated that review of the rental agreement there "should be limited in a manner analogous to the statutorily constrained role the courts may play in reviewing arbitration awards under the Uniform Arbitration Act (Ill. Rev. Stat. 1977, ch. 10, pars. 101 [through] 123)," even though the Act did not apply because the contract called for an "appraisement." *Bailey*, 75 Ill. 2d at 545, 389 N.E.2d at 1196. Since the parties had agreed the arbitrators had "binding authority to conclusively and finally establish the fair cash rental value of the premises," it was proper for the trial court to defer to the meaning the arbitrators ascribed to the terms they used. *Bailey*, 75 Ill. 2d at 546, 389 N.E.2d at 1196.

Recently, this court has noted:

> "Arbitration awards should be construed, wherever possible, to uphold their validity. \*\*\* The general view is that judicial review of an arbitrator's award is more limited than appellate review of a trial court's decision. [Citation.] An award will not be set aside due to gross errors in judgment in law or gross mistakes of fact by the arbitrator unless the errors or mistakes are apparent on the face of the award." *Hayes v. Ennis*, 278 Ill. App. 3d 121, 127, 662 N.E.2d 910, 913 (1996).

In *Tim Huey Corp. v. Global Boiler & Mechanical, Inc.*, 272 Ill. App. 3d 100, 649 N.E.2d 1358 (1995), this court held that "[i]f the arbitrators have acted in good faith, however, the award is conclusive upon the parties. \*\*\* Such deference is accorded because the parties have chosen in their contract how their dispute is to be decided, and judicial modification of an arbitrator's decision deprives the parties of that choice." *Tim Huey*, 272 Ill. App. 3d at 106, 649 N.E.2d at 1362. This court did note that "gross errors of judgment in law or gross mistakes of fact may be reviewable if they are apparent upon the face of the award" (*Tim Huey*, 272 Ill. App. 3d at 106, 649 N.E.2d at 1363).

We turn first to the question of whether the decision by Johnston, approved by Hilst, not to consider obsolescence was a gross error of law. The policy provided for limits of $100,000 each as to the building and its contents and further provided the insured would not be paid

more than its "financial interest" in the property with any loss determined "[a]t actual cash value." The major problem in this case arises because the "actual cash value" of the building, as determined by the appraisers ($100,000), grossly exceeded any indication of market value.

The evidence was undisputed that one week before the fire, the Knake brothers purchased the property for $67,500. Shortly before that time, two appraisers appraised the premises at a market value of $69,900 and $71,000, and both valued the bare land at $52,500, in effect deeming the building to have a market value of only $17,400 or $18,500. Thus, the appraisers' award here would seem to place the "actual cash value" of the building at approximately five times its market value.

■ The parties agree that "actual cash value" and market price or value are different concepts, and the major distinguishing characteristic is that determination of "actual cash value" begins with a determination of the cost of replacement while market price is determined by what people would be willing to pay for a property. A very ornate and expensive house in an area where people would not want to live would have a high replacement cost but a low market value. The parties also agree that in arriving at "actual cash value" a deduction must be made from replacement cost to account for depreciation for age. See *C.L. Maddox, Inc. v. Royal Insurance Co.*, 208 Ill. App. 3d 1042, 1055, 567 N.E.2d 749, 757 (1991); *Chicago Title & Trust Co. v. United States Fidelity & Guaranty Co.*, 511 F.2d 241, 244-45 (7th Cir. 1975), both citing *Smith v. Allemannia Fire Insurance Co.*, 219 Ill. App. 506, 513 (1920) ("Appellee under his policies is entitled to be indemnified hence actual cash value means reproduction value less depreciation for age and not market value").

Plaintiff asserts that in determining "actual cash value" a deduction from replacement cost must be made for obsolescence either as an aspect of depreciation or as an additional item. Hilst's report explained there is:

> "an essential difference between a market value appraisal and an insurance appraisal. In estimating market value, the presence of obsolescence, both economic and functional, must always be reflected in the estimate of value. *In insurance appraisal*, the general rule is that where a property is being used for the purpose for which it was designed, or is usable for that or another purpose, *obsolescence is not a factor in estimating depreciated insurable value.*" (Emphasis added.) J. Purdon, *Appraisal for Insurance Purposes*, Encyclopedia of Real Estate Appraising 1133, 1135 (3d ed. 1978) (hereinafter Encyclopedia).

(The encyclopedia uses the term "depreciated insurable value" instead of "actual cash value" to avoid the confusion the latter term can cause "because it implies a relationship to market value," but they denote the same concept. Encyclopedia at 1135.)

■ The parties agree that the purpose of a policy of fire and extended-coverage insurance is to insure, as much as reasonably possible, that the insured will be in nearly as good a position after the event insured against as before that event. *Chicago Title*, 511 F.2d at 245. When a chattel is lost, it can often be replaced by the purchase of a similar chattel. This is not as easy with real estate. For that reason, the theory of not considering obsolescence stated by Hilst makes sense.

Here, the burned building was across the street from a building already owned by defendant. Location may well have been a matter of value to defendant and it may want to rebuild. The location value of the building to the insured would not be an element in determining actual cash value but it is a logical reason why the appropriate measure of loss to the insured is replacement value less depreciation rather than market value, in which obsolescence would be a factor. On the other hand, the market value appraisal pointed out that Havana properties had economic obsolescence due to unemployment and lack of industry in the area. The same report indicated that although the building had deterioration because of age and wear, it did not indicate any other obsolescence. The deduction for depreciation taken properly accounts for that aging and wear.

The record does not disclose the exact purpose for which the building was designed, but all available information would indicate that it was designed for commercial or manufacturing purposes. At the time of the sale, it was being used as an "automotive building." The fact that plaintiff paid defendant $100,000 for the loss of contents in the building would indicate that commercial use of the building was continuing. As the plaintiff is contending that the appraisal was a "palpable and gross mistake," the burden would be upon it to show that the building was neither used nor usable as designed, if that would make a difference as to whether consideration of obsolescence was required. Moreover, the report by Hilst indicated that obsolescence should not be a factor, as long as the building would be usable as designed.

Citing *Allied American Insurance Co. v. Washburn*, 159 Ill. App. 3d 1035, 513 N.E.2d 50 (1987), plaintiff asserts that obsolescence is inherently an element of depreciation. However, the issue there was whether the Illinois Director of Insurance could enact a rule that "completely bann[ed] the issuance of all automobile insurance for

physical damage coverage based on a stated value of the automobile less its depreciation." *Washburn*, 159 Ill. App. 3d at 1037, 513 N.E.2d at 52. The appellate court held the regulation was beyond the power of the Director. The court noted a definition of depreciation that described it "as '[a] decline in value of property caused by wear *or obsolescence* and is usually measured by a set formula which reflects these elements over a given period of useful life of property.' " (Emphasis added.) *Washburn*, 159 Ill. App. 3d at 1039, 513 N.E.2d at 53, quoting Black's Law Dictionary 397 (5th ed. 1979).

*Washburn* concerned a policy for damage to or loss of a chattel and an interpretation of payment for loss that approaches market value. The *Washburn* opinion pointed out that the owner of a special vehicle, such as an antique car, could obtain a "stated value" policy with a definite depreciation schedule. *Washburn*, 159 Ill. App. 3d at 1039, 515 N.E.2d at 53.

Plaintiff complains that Johnston's appraisal considered a procedure known as the Marshall-Swift method but did not make a deduction for obsolescence, which is an element of that procedure. This was entirely consistent with Johnston's theory that obsolescence was not a proper deduction from reproduction cost here.

In *Bailey*, the issue was the meaning of the phrase "Gross Income" in a lease, and the Supreme Court of Illinois stated that in passing upon the award of appraisers or arbitrators, they, rather than courts, should "clarify" the terms involved. *Bailey*, 75 Ill. 2d at 545, 389 N.E.2d at 1196. Here, somewhat similar deference should be given to the determination of "actual cash value." The theory that obsolescence was not a required deduction had logic behind it and we do not deem it to be a gross mistake of law or fact to use it.

■ We next consider whether the disparity between the market value of the building and the award indicates the award was fraudulent or against public policy. We note that even under plaintiff's appraisal, the reproduction cost of the building would be approximately $88,500. Under this figure, defendant would get a new building and $11,500 in addition. That amount of windfall would not indicate fraud, and use of those figures gives no deference to the determination of the majority appraisal that the cost of rebuilding would be much higher.

The disparity in value also does not violate public policy. Courts may refuse to enforce arbitration awards that contravene "a well-defined and dominant public policy, as ascertained ' " 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " ' " *Tim Huey*, 272 Ill. App. 3d at 110, 649 N.E.2d at 1365, quoting *Department of Central Management Services*

*v. American Federation of State, County & Municipal Employees*, 245 Ill. App. 3d 87, 93-94, 614 N.E.2d 513, 517 (1993), quoting *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766, 76 L. Ed. 2d 298, 307, 103 S. Ct. 2177, 2183 (1983), quoting *Muschany v. United States*, 324 U.S. 49, 66, 89 L. Ed. 744, 756, 65 S. Ct. 442, 451 (1945).

In *Whitten v. Cincinnati Insurance Co.*, 189 Ill. App. 3d 90, 544 N.E.2d 1169 (1989), a defendant sold homeowners insurance that went into effect before plaintiffs closed on the home. After the insurance went into effect, but before closing, the house was destroyed by lightning. *Whitten*, 189 Ill. App. 3d at 93, 544 N.E.2d at 1171. The sale was called off and the seller returned plaintiffs' earnest money. *Whitten*, 189 Ill. App. 3d at 94, 544 N.E.2d at 1171. Plaintiffs subsequently bought the property under a new agreement with the price *reduced by the amount the seller received for the destruction of the house from its insurer*. *Whitten*, 189 Ill. App. 3d at 94, 544 N.E.2d at 1171. Plaintiffs nevertheless maintained they were entitled to the full amount of the insurance policy they had purchased from defendant. *Whitten*, 189 Ill. App. 3d at 92, 544 N.E.2d at 1170.

This court upheld the circuit court's rejection of the request on public policy grounds for two reasons. First, allowing full recovery might "encourage future fraud on insurance companies" by "provid-[ing] an incentive for an unscrupulous home buyer to insure the property to be purchased, burn it, pay a reduced price for it, and then recover fully under the insurance policy." *Whitten*, 189 Ill. App. 3d at 100, 544 N.E.2d at 1175. *Second, a full recovery would unjustly enrich plaintiffs. Whitten*, 189 Ill. App. 3d at 100, 544 N.E.2d at 1175.

The situation here differs materially from *Whitten*. There, the fire occurred before the sale. The insureds purchased at a price that reflected only the value of the bare land. The sellers had collected from their insurance the full amount for the destruction of the building. Here, the fire occurred after the sale and no one else was paid for the loss. While the situation here does present some windfall to defendant if it does not choose to rebuild, we do not have a situation in which two recoveries are had for the same insured loss with the accompanying incentive for arson.

This case also differs from *Lieberman v. Hartford Fire Insurance Co.*, 6 Ill. App. 3d 948, 287 N.E.2d 38 (1972), and *Aetna State Bank v. Maryland Casualty Co.*, 345 F. Supp. 903 (N.D. Ill. 1972), where recovery under insurance policies was denied for fire losses to buildings when they were deemed worthless and about to be demolished. We also note that here an agent of plaintiff inspected the building, agreed to write a $100,000 limit on recovery for the building, and charged a premium based on that exposure. The building here was a

total loss. The determination of policy limits and assessment of premium did not make the policy a valued policy that would automatically make the $100,000 loss figure applicable for a total loss. Rather, the determination of $100,000 policy limits and assessment of premium thereon tends to negate any contention by plaintiff that the request here for $100,000 damages for a total loss is fraudulent or inherently unfair.

■ We also hold that Hilst was not shown to have had a disqualifying conflict of interest. Plaintiff made no objection to the appointment until Hilst filed his report. Plaintiff's verified motion alleged that Hilst was a member of the Havana Chamber of Community Development and a close friend of "the insured's owner" and contended that the refusal of Hilst to consider obsolescence and the gross disparity between the appraisal, which Hilst approved, and the other appraisals indicated bias. Hilst filed a counteraffidavit stating he had "never been a close friend of, neighbor of, had a personal relationship with, or intimately known" any of the Knakes and had never lived within seven blocks of them nor been with them except at a "large social gathering" some 20 years earlier. No other evidence was presented. The only contention of plaintiff that was not disputed was the allegation that Hilst was a member of the Chamber of Community Development. That was not of itself a disqualifying bias.

We would also note that Hilst, who broke the tie between the parties' appraisers, was appointed by the court. Thus, neither side had an advantage in the selection of appraisers.

We affirm the judgment of the circuit court upholding the award arising from the appraisement.

Affirmed.

McCULLOUGH, J., concurs.

JUSTICE COOK, dissenting:
In this case, General Casualty Company (General Casualty) has been ordered to pay its policy limits, $100,000, for the loss of a building purchased one week before the loss for about $21,000.

Tracer Industries, Inc. (Tracer Industries), operates a machine shop on South Street in Havana. Across the street from the machine shop was a one-story brick and concrete block auto store and garage, built in 1943. Tracer Industries purchased the auto store and garage on December 23, 1993, paying $67,500. At the time of the purchase, Tracer Industries' appraiser, Van Bitner, calculated the value of the

land to be $50,000, and the value of the building to be $21,134. Another appraiser employed by Tracer Industries, Connie Kennedy, valued the land at $52,500, and the building at $17,400. On December 30, 1993, the auto store and garage burned. Tracer Industries' appointed appraiser, James Johnston, then determined that the actual cash value of the building was $111,900, and the umpire agreed. Accordingly, General Casualty was ordered to pay its policy limits, $100,000. General Casualty also paid $100,000 for the contents of the building.

General Casualty's appointed appraiser, William Hall, determined that the auto store and garage had an actual cash value of $34,065.44. Johnston explained that his appraisal was so different from the others because he did not consider market value or obsolescence. He considered only the cost of reproduction less depreciation for age.

There are problems with using market value to determine the actual cash value, for insurance purposes, of a building destroyed by fire. See 15 Couch on Insurance 2d §§ 54:134 through 54:138 (rev. 1983). Market value only works where there is a true market in which like items are regularly bought and sold. *Smith*, 219 Ill. App. at 512. Unlike mass-produced personal property, all buildings are unique, and some are very unique. As Johnston said in his appraisal, "[c]hurches, schools, municipalities and special purpose properties typically have little or no easily determinable market value since they are seldom or never sold." It is also difficult to determine the value of a building separate from the land on which it sits; buildings are usually not sold separate from the land. *Smith*, 219 Ill. App. at 512. The market goes up and down, and an insured who is obtaining full use from his property should not be penalized because his loss occurs during a time of recession. An insured who obtains a building for a bargain price (a price below market price) should not lose the benefit of his bargain when the building is destroyed.

The insured is entitled to be indemnified, to be placed in as good a position as he would have been if no fire had occurred. The insured is entitled to what the building is worth to him, even if it is not worth that much to anyone else. *Smith*, 219 Ill. App. at 512. A building may have an odd design, pleasing only to the insured, but if the insured is able to use it for his purposes, his recovery should not be limited to what others would pay for it. The insured may have placed a desirable building in an odd location, where no one else would want it, but if the location suits the insured's purposes, he should not be limited to market value. Location (external obsolescence) is not a factor in determining actual cash value unless it limits everyone's, including the insured's, use of the property.

All of these factors warrant caution when market value or obsolescence is considered in determining actual cash value. The difficulty is that none of these factors apply in this case. If market value is different from reproduction cost less depreciation, there must be a reason for that difference. Johnston has provided no factual support for his refusal to consider market value or obsolescence. This was not a unique building for Tracer Industries. Apparently Tracer Industries used the building for storage and minor work such as painting. Almost any building, even an old church or school, would have served those purposes. There is a market for old buildings usable for storage purposes. Any old building will do. Although it is difficult to separate the value of a building from the value of the land, Johnston's appraisal was almost twice the value of this building *with* the land. This was not a case where Tracer Industries bought high and is being forced to sell low because of market fluctuations. The loss occurred only a week after Tracer Industries bought the property. There is no indication Tracer Industries bought this property for a bargain price; instead, it appears Tracer Industries paid fair-market value. Perhaps the location, near its property, was valuable for Tracer Industries, but location is not a factor in determining the actual cash value of a building.

The majority at one point rejects the use of market value because market value considers location (an expensive house "in an area where people would not want to live" would have a low market value (285 Ill. App. 3d at 422)). At another point, in contrast, the majority attempts to support Johnston's unbelievable appraisal with the observation that location may have been a matter of value to Tracer Industries, as the burned building was right across the street from a building already owned by defendant. 285 Ill. App. 3d at 423. Contrary to the approach taken by the majority, both parties agree that location (external or economic obsolescence) may not be considered in determining the actual cash value of a building. See *Smith*, 219 Ill. App. at 512. The only question in this case is whether functional obsolescence may be considered.

The Marshall & Swift materials, used by Hall and perhaps used by Johnston, contain the following:

> "External, locational or economic obsolescence is loss in value due to causes outside the property and independent of it, and is not included in the tables."

> "External Obsolescence is a change in the value of a property, usually negative but can be an enhancement, caused by forces outside the property itself, and is not included in the tables that follow. The type of property being evaluated, whether residential

or commercial, will be impacted differently by these external forces. For example, it is desirable or advantageous for a manufacturing plant to be situated close to a railroad spur; conversely, it is a disadvantage for a residential property to be located close to that same spur."

It is ironic that the majority first rejects the use of market value because market value considers location, then attempts to justify Johnston's appraisal on the basis of location. No doubt the location here is valuable to Tracer Industries, but Tracer Industries owned the location even after the fire. The question is what value the building had to Tracer Industries.

The umpire stated the correct approach: "In insurance appraisal, the general rule is that where a property is being used for the purpose for which it was designed, or is usable for that or another purpose, obsolescence is not a factor in estimating depreciated insurable value." Encyclopedia at 1135. In the present case, however, the property is not used or usable as an auto store and garage. Tracer Industries is making some use of the building, but not the use for which it was designed, or any comparable use. Tracer Industries does not need a brick and concrete block building for its purposes. A metal shed would do as well.

The majority opinion states that at the time of the sale, the auto store and garage was being used as an automotive building. I question that. I recognize that the building was used for those purposes at one time, but I see nothing in the record that indicates that the building was being used for any purpose at the time of sale. There was no evidence on that subject because it was irrelevant to Johnston whether the building was functionally obsolescent: whether it was used or usable for a purpose similar to that for which it was originally designed.

Tracer Industries' argument that a court may never consider market value or obsolescence is not supported by Illinois law. The *Smith* case is cited for the hard-line rule that market value may never be considered in building loss cases, but it was the insured in *Smith* who tried to use fair-market value, in order to prevent the application of a coinsurance or average clause. When it came to his claim, however, the insured argued for reproduction value without any deduction for depreciation. Apparently the figures for market value and reproduction cost less depreciation for age were about the same. In *Smith*, the reproduction cost was about $150,000, and the policy limits were $86,000, indicating that coinsurance applied, despite the insured's argument that fair-market value was about $90,000. Even though the damage to the building was clearly less

than 50%, the trial court awarded damages of $78,409.26, prompting the appellate court's remark that "[s]uch results are absurd." *Smith*, 219 Ill. App. at 511. There is no indication in *Smith* that market value or obsolescence may not be considered in a proper case. The *Maddox* case simply cited the statement in *Smith* that actual cash value means reproduction costs less depreciation for age and not market value. *Maddox* did not discuss the reasons for the rule or indicate how the rule applied to the facts of that case.

Subsequent cases make it clear that obsolescence must often be considered in determining actual cash value. When a building has been abandoned, or is in the process of demolition, the insured is not entitled to reproduction costs if the building is destroyed by fire. *Lieberman*, 6 Ill. App. 3d at 950, 287 N.E.2d at 40 (insured "suffered no loss by its destruction"). In *Knuppel v. American Insurance Co.*, 269 F.2d 163 (7th Cir. 1959), the court excluded evidence that the insured intended to demolish his building and build a new one, but noted there was no evidence that the insured structure was no longer useful for the purposes for which it was designed. To the contrary, the building was in actual use for restaurant-tavern purposes. *Knuppel*, 269 F.2d at 166. It appears that the seventh circuit has now adopted a "broad evidence rule," under which, in arriving at actual cash value, the trier of fact is entitled to consider all evidence relevant to the value of the property at the time of the loss, including both market value and reproduction value. *Chicago Title & Trust Co. v. United States Fidelity & Guaranty Co.*, 511 F.2d 241, 245 (7th Cir. 1975).

In *First National Bank v. Boston Insurance Co.*, 17 Ill. 2d 147, 160 N.E.2d 802 (1959), the supreme court held that an insured who had contracted to sell an old 25-room mansion for $19,000 was not limited to the contract price when the mansion was destroyed, but in that case there was no indication that $19,000 was the fair-market value of the mansion. The vendors may have fallen on hard times and been forced to sell quickly. "[M]any factors that are irrelevant to an objective determination of value may enter into the determination of price between vendor and vendee." *First National*, 17 Ill. 2d at 151, 160 N.E.2d at 805.

Exclusive use of the replacement-cost-less-depreciation test not only unjustly enriches the insured but may provide an incentive for arson. S. Marcus, *Actual Cash Value, Illinois and the Broad Evidence Rule: "A Modest Proposal,"* 59 Ill. B.J. 1000, 1010 (1971); J. Ingram & P. Giroux, *Illinois Should Adopt the "Broad Evidence Rule" in Insurance Indemnity Cases*, 71 Ill. B.J. 14, 18 (1982).

The majority argues that if General Casualty was willing to write

a policy on this property with limits of $100,000 and charge a premium, it cannot complain if it is required to pay that amount. 285 Ill. App. 3d at 426. The majority is mistaken. This is not a valued policy. See 44 Am. Jur. 2d *Insurance* § 1511 (1982). The mere statement of a policy limit does not create a valued policy, that is, one in which the parties substitute their present assessment for the result of a later controversy. *Morreale v. National Fire Insurance Co.*, 298 F.2d 96, 97 (7th Cir. 1962). "In *Lieberman* [(where the building was being demolished)] *** the insured had paid a premium for what turned out to be no insurance at all." *Chicago Title*, 511 F.2d at 247. General Casualty's obligation was limited to the actual cash value of the property at the time of the loss, whatever that was. In *Smith* the insured argued that the insurer was estopped, for purposes of the coinsurance clause, from denying that the value of the property was other than that discussed when the policy was written. The court rejected that argument, noting that a representation of value at the time the policy was written could not operate as a representation of the value at the time of the loss. *Smith*, 219 Ill. App. at 509.

Courts must give great deference to the decisions of arbitrators and agreed appraisers, but those decisions are not immune from attack. The use of arbitrators cannot be allowed to halt the development of substantial case law. *State Farm Fire & Casualty Co. v. Yapejian*, 152 Ill. 2d 533, 542-43, 605 N.E.2d 539, 543 (1992). Johnston's appraisal is at odds with the law, and his conduct makes it clear that he was a "hired gun," employed by the insured to come up with an excessive valuation. So-called experts can usually be obtained to support most any position. *People v. Enis*, 139 Ill. 2d 264, 289, 564 N.E.2d 1155, 1165 (1990). It is essential that there be assurance as to the impartiality of the arbitrator. *Drinane v. State Farm Mutual Automobile Insurance Co.*, 153 Ill. 2d 207, 212, 606 N.E.2d 1181, 1183 (1992). I would find that the actions of Johnston crossed the line for review, that his actions constitute "fraud, misconduct or palpable or gross error or mistake" (*Hetherington*, 311 Ill. App. at 583, 37 N.E.2d at 368), or a gross error in judgment in law or gross mistake of fact apparent on the face of the award (*Hayes*, 278 Ill. App. 3d at 127, 662 N.E.2d at 913).

To quote *Smith*, an appraisal of $111,900 for a building purchased a week earlier for a fair-market value of $21,000 and having no special value to the insured is "absurd." *Smith*, 219 Ill. App. at 511. "It is self-evident that a theory that produces such results is wrong in principle and that evidence offered in support of it is unworthy of consideration." *Smith*, 219 Ill. App. at 511.